### NEW RIVER YACHTING CENTER, INC., a Florida Corporation, Plaintiff,

v.

### M/V LITTLE EAGLE II, her engines, tackle, etc. and owner, Thomas W. Schlaebitz, Defendants.

### No. FL 75–16–Civ–NCR.

United States District Court,
S. D. Florida,
Ft. Lauderdale Division.

Sept. 30, 1975.

---

Edward Porch, McCormick, Bedford & Backmeyer, Miami, Fla., for plaintiff.

John H. Schulte, Smathers & Thompson, Miami, Fla., for counter-defendant New River.

Cramer & Matthews by F. Lawrence Matthews, Miami, Fla., for defendant in rem M/V LITTLE EAGLE II and counterclaimant Schlaebitz.

## MEMORANDUM OPINION

ROETTGER, District Judge.

The negative aspect, judicially speaking, of a boating paradise is a deluge of suits by boatyards against boat owners involving an unpaid claim for work performed on the vessels and an inevitable counterclaim that the work was not performed in workmanlike fashion, or the owner's personal property was stolen or both. Personal feelings run so strongly on both sides that they seldom settle. This suit is typical but it has an atypical extra: while the boatyard was acting as a substitute custodian for the U. S. Marshal who had seized the vessel, the boat sank. Predictably, the boat owner has counterclaimed charging the boatyard with negligence which caused the boat to sink or with negligent safekeeping in not perceiving the sinking condition of the vessel in time to save it.

Defendant boat owner Schlaebitz was operating a shipping company out of Saigon and Phnom Penh. He left there for obvious reasons and went to Singapore for a few months but returned to the United States because of reasons of health. Since he was familiar with ships and boats he decided to buy a boat, restore it to sound condition and sell it at a profit. At that time the motor vessel LITTLE EAGLE II, a 55 foot, 1956 Chris Craft Constellation, was tied up at

a pier in plaintiff's yard in Fort Lauderdale. The flush-deck yacht had sunk in 1973 in Miami due to a discharge hose giving way and had been towed to plaintiff's yard. The owner of the yard, Dario Bacchiocchi, bid on the boat and its engines but the owner decided to sell the boat and engines separately. Defendant Schlaebitz was the successful bidder for the sum of $13,000 on the hull without the engines. He installed rebuilt engines and made numerous repairs and improvements.

Defendant Schlaebitz authorized plaintiff yard to perform certain work[1] on the vessel in June 1974 and while the work was being performed, he went to Rhode Island to work on Mr. Bacchiochi's yacht. Upon his return in July, 1974, Schlaebitz discovered the doors on his boat had been removed at the hinges; a number of tools, a collapsible boat and an outboard motor he had stored in the stateroom were missing. At that point Schlaebitz had a credit balance with the yard but made no payments after that time because of his dispute with the yard over who was responsible for the missing articles.

The court notes that defendant never complained about the workmanship done by the yard in connection with the payment of his bill, but stated that he would pay his bill when the boat was sold. In the winter of 1974 the boat was listed for sale at a price of $45,000, but the yard, tired of waiting for payment, filed suit for its claim of $2410.73 and had the boat arrested on January 27, 1975.

Following the standard procedure in this area of using a substitute custodian in order to avoid the minimum daily charge of $78 assessed by the United States Marshal, plaintiff yard sought the appointment of a substitute custodian, namely, itself. An order was entered on February 6th, 1975 authorizing plaintiff yard to serve as substitute custodian.

The yard used a security service at nights; on the night of February 24th a guard working for it made several rounds of the boatyard and made his last round checking the vessels at 0430. The guard, a college student, finished work at 0630 and carried on a conversation by his car prior to leaving. He testified that although it was dark, there was some light from the full moon and he saw nothing about the boat some thirty feet away which attracted his attention.[2]

About 0730 or shortly thereafter, Ms. Jean Dario Bacchiocchi, Vice President of the yard and its chief executive officer, was walking from her nearby houseboat to the office and noticed the boat was sitting on the bottom with about two feet of freeboard.

After the theft of his personal articles, Mr. Schlaebitz had locked the doors to his boat and had placed a sign on them which read: "Warning—Do not attempt to enter this boat—certain devices aboard will make it detrimental to your health and will result in grave injuries." In addition, he told a secretary at the boatyard and other employees that the boat was "wired." From Ms. Bacchiocchi's expression during the testimony, the court is persuaded that she clearly was afraid that a spring-gun or some explosive device had been rigged by Mr. Schlaebitz in the boat. After seeing the sign at the time of the boat's arrest, the Marshal ordered the custodians he placed on the boat not to go inside it; similar orders had been given by Ms. Bacchiocchi to the yard's employees.

It was uncontradicted that the cause of the sinking was an open seacock, or gate valve, in the aft guest head. A starboard porthole located approximately one foot above the boat's water line was

---

1. The order was basically to haul and paint the bottom, pull the props and miscellaneous matters.

2. On a prior occasion he had noticed a boat taking on water and by prompt action had prevented its sinking.

also open and greatly accelerated the sinking once the water reached the portlight. The testimony was uncontradicted that the seacock had been opened for some time and had been painted in the open position. Defendant Schlaebitz had performed the painting in this area and admitted painting over it without looking at it. A rubber bung cover had apparently prevented an earlier sinking but it had finally given way.

■ Since the yard employees were under strict orders not to go aboard the vessel because of the spring-gun warning, and because defendant Schlaebitz had showed prospective purchasers who had boarded the vessel twice after it had been arrested by the Marshal, the court finds that the open porthole probably resulted from the actions of the boat owner rather than the boatyard; in any event, the counterclaimant has not carried its burden of proof with regard to charging the boatyard with negligence as to the open porthole.[3] And clearly the boat owner is responsible for the open seacock valve, the original exposure to the sea.

Since the court necessarily finds the responsibility for the sinking must be laid upon the boat owner, the next question presented is whether the boatyard was negligent in failing to observe the sinking condition of the boat in time to take action to prevent the sinking. The boatyard contends it made appropriate checks of the boat and that the spring-gun warning would have prevented adequate pumping if its sinking condition had been observed; the owner asserts negligent surveillance and that the lazeret and forward hatch were still available for pumping even if the doors of the cabin weren't opened.

The evidence presented as to the time it would have taken the boat to sink lacks firm reliability and is of little assistance to the court. Using the longest interval of time possible for the boat to sink would result in a time-frame of less than two hours; the court is persuaded from the evidence that the actual time of sinking took less than one and one-half hours. Although the boat may well have been in a sinking condition at the time the guard observed it at 0630 there would have been nothing to have aroused his attention because the photographs reveal the actual water line of the vessel was a few inches below the boat's boot top.

■■ With these findings in mind, the law on the subject of duty of a custodian after arrest of a vessel is fairly clear as to the United States Marshal. In *Matoil Service & Transport Co. v. Schneider,* 129 F.2d 392 (3d Cir. 1942), the duty is spelled out as follows:

"The duty of a Marshal with respect to property which he seizes by virtue of legal warrant is that he keeps such property, while in his custody, in a safe and secure manner so as to protect it from injury to the end that, whether it be condemned or restored to the owner, its value to the parties will not have been impaired by unnecessary deterioration or damage for which the custodian could be responsible. 2 Benedict on Admiralty, 6th Ed. 1940, § 301." *Id.* at 394. Accord, *Averill v. Smith,* 17 Wall. 82, 84 U.S. 82, 21 L.Ed. 613 (1873).

The duty of a substitute custodian must be at least that of the United States Marshal. Defendant suggests that the substitute custodian should be held to a duty of extraordinary diligence because, similar to a bailment situation,[4]

---

3. Defendant contends the yard should have noticed the open port and closed it. Even if the yard had noticed it, the court cannot find that the yard had the duty to ignore defendant's warning sign and close the port. Defendant is hoisted on the petard of his own sign.

4. It must be noted that defendant specifically abandoned the counterclaim count based upon a bailment theory and travelled only upon its count of negligence.

the custody of the boat was for the sole benefit of plaintiff boatyard. The court must conclude that the duty of substitute custodian is the same as that of a United States Marshal and is basically the exercise of reasonable care under the circumstances.

Testing the conduct of plaintiff boatyard against the standard required of a substitute custodian, it is apparent that defendant can recover on its counterclaim only if (1) the yard should have maintained a custodian around the clock, or made patrols on a frequency of as short a time interval as one hour, or (2) a stripe or warning marker should have been placed on the hull of the vessel while it was under arrest in order to provide an alert that it was foundering.

If the law requires that a custodian be maintained around the clock, there would be no purpose in obtaining a substitute custodian in an effort to reduce the Marshal's costs. Nearly all of the costs incurred by the Marshal result from placing a guard aboard the vessel, however small, around the clock.

When the litigation involves boats of moderate size and not ships, such a cost may be so prohibitive that the value of the vessel is consumed by the Marshal's charges. See the excellent and pragmatic discussion of this problem in *United Virginia Bank v. Sea Queen*, 1971 A.M. C. 1880, 1884 (E.D.Va.1971).

■ The evidence revealed it was not the custom to maintain a watchman on pleasure craft tied up in boatyards and marinas. In the *Kathryn B. Guinan*, 176 F. 301 (2d Cir. 1910) a commercial 100-foot scow capsized at the pier and the court rejected the assertion that the claimant of the vessel is responsible because he left her without a watchman during the night. They noted that there was no evidence of any custom to keep a watchman on boats lying in the slips of New York Harbor and that such a bur-

den would be very onerous. Similar holdings are found in a number of cases: *The Beeko*, 10 F.2d 884 (E.D.N.Y. 1925). (Vandals released the vessel's lines causing it to drift into another boat; no conclusion of negligence because of the lack of a watchman;) *United Virginia Bank v. Sea Queen, supra* (Question of reasonable care not presented but inspection of a leaking vessel four or five times a day entitled the inspector to custodial costs.); See *United States v. Carroll Towing Co.*, 159 F.2d 169 (2d Cir. 1947) (L. Hand, Judge; reviewing various maritime cases involving the absence of a bargee and devising a formula for what is reasonable care under those circumstances.)

In the instant case the custodian made rounds every two hours or so and had made several rounds that evening. The court concludes such conduct is reasonable care under the circumstances, especially when the boat was not in a leaking condition and was known to have automatic bilge pumps aboard. The court declines to impose any hard-and-fast requirement of an inspection every hour or every hour-and-a-half although under certain circumstances failure to do so could be negligence.

The evidence was unanimous that there was no custom of painting a water line on a boat while it was in custody. Plimsoll lines are found on commercial vessels and a dead ship, i. e., one without engines in working order and condition and no power to generate electricity, should have a mark painted at bow and stern to indicate the present water line. *Manual for U.S. Marshals—Procedures in Admiralty*, § 525, as published in 1972 A.M.C. 569, 578.[5]

The LITTLE EAGLE had a red boot top painted from stem to stern, several inches above the actual water line. Under these conditions it would have been pointless for the substitute custodian to

---

5. During the court's experiences as a Naval Officer, the court is aware of the practice of the Navy in painting a line at the bow of a "moth balled" vessel, just above the ship's water line. This was to alert security patrols in the event a ship in the moth ball fleet began to sink so that they could take appropriate action.

paint one more line as a warning to its security guards. Therefore, it was reasonably prudent for plaintiff to utilize the boat's boot top and bellyband as a warning indicator.[6]

Finally, defendant contends that the court should establish guidelines of a high degree of care on boatyards acting as substitute custodians when the claim of the yard is small in comparison to the value of the vessel. However tempting defendant's contention may be, the formulation of such policy is outside this court's prerogative.

Consequently the court must conclude that the substitute custodian has met the standard of care required of the United States Marshal as custodian under such circumstances and judgment is entered for boat's owner on his counterclaim only in the amount of $730.00, representing the items of personal property stolen from the boat while the boat was in the custody and control of the plaintiff-yard. Plaintiff-yard is entitled to recover its lien for repairs in the amount of $2430.17. Judgment to be entered accordingly.

---

6. Without a boot top above the water line to attract attention if a boat takes on water, some form of a warning strip, preferably by a plastic tape to avoid the expense of repainting, would be prudent action on the part of a substitute custodian.