**HUMPHREYS RAILWAYS, INC., Plaintiff,**

v.

**F/V NILS S, her engines, tackle, etc., in rem, Defendant.**

Civ. A. No. 84–19–N.

United States District Court, E.D. Virginia, Norfolk Division.

Dec. 12, 1984.

G.W. Birkhead, Vandeventer, Black, Meredith & Martin, Norfolk, Va., for plaintiff.

John D. Padgett, Jett, Agelasto, Berkley, Furr & Price, William B. Eley, Willcox & Savage, R.M. Hughes, Seawell, Dalton, Hughes & Timms, Norfolk, Va., for intervenors.

## ORDER

DOUMAR, District Judge.

The plaintiff Humphreys Railways, Incorporated (Humphreys) and intervenors Eirik's Dock (Eirik's), Nils Sletten, and

Bernice Isaksen, are parties in this *in rem* admiralty action brought to enforce various maritime liens against the defendant, a 120 foot fishing vessel called the NILS S. The vessel was arrested and sold at auction by the U.S. Marshal on March 16, 1984 to Mr. Nils Sletten, the owner of a ½ interest in the vessel at the time of the attachment. The resulting fund of $115,000.00 was held by the Court for disbursement to competing claimants. Upon the stipulation of the parties, $33,309.51 was disbursed to Humphreys as compensation for its prior repairs to the NILS S, and $844.50 was disbursed to Eirik's for fuel oil supplied the vessel. A remaining fund of $80,845.99 is being held by the Court with the following maritime claims outstanding in no particular hierarchy:

F/V NILS S

1. Humphreys Railways – wharfage fees or custodial fees of $100/day as substitute custodian for 152 days (11–29–83 to 5–1–84)   $30,400.00

2. Eirik's Dock wharfage fees at $100/day for 118 days (4–12–83 to 8–5–83)   $11,800.00

TOTAL CLAIMS:   $42,200.00

Mrs. Isaksen, the owner of ½ of this vessel, brought another action against Mr. Sletten, the other ½ owner, seeking to enforce or to claim damages by virtue of an alleged contract of sale. This action resulted in a jury verdict of no contract.

We are here concerned only with the lien claims against the vessel and the corresponding claims against the funds of the vessel after its sale by the Court.

## I. EIRIK'S CLAIM

In April 1983, the NILS S was owned by a joint venture or partnership of Mr. Kristian Isaksen and Nils Sletten. Mr. Sletten was the absentee owner and Mr. Isaksen, either for himself, or through his sons, operated the vessel. Mr. Isaksen met his untimely death on April 12, 1983. Mrs. Bernice Isaksen, his widow, inherited and apparently succeeded to his interest in the NILS S. At her husband's death, she asked a friend, Eirik Kirkeberg, owner of Eirik's Dock, if the vessel could be moored at his dock in Wildwood, New Jersey, which he owned and operated. The NILS S had previously been docked at Eirik's in the past and the Kirkebergs and Isaksens evidently had a social relationship. Mrs. Isaksen, a nurse, had previously cared for Mrs. Kirkeberg. With respect to said prior occasions that the vessel was docked at Eirik's, it was not fishing out of nor being repaired there. However, there was no charge for the wharfage.

Mr. Kirkeberg testified that he agreed to allow the NILS S to be docked at his facility upon Mr. Isaksen's death. At the time of its docking, there was no charge set for wharfage. Mr. Kirkeberg felt that he was entitled to a reasonable fee for the wharfage for keeping the vessel, and this Court finds that no specific contract was entered into between Mr. Kirkeberg and Mrs. Isaksen for wharfage.

The vessel remained at Eirik's Dock from April 12, 1983 to August 5, 1983, or a total of 118 days. The Court finds as a fact that there was neither an express written, nor oral agreement, as to a wharfage charge. Indeed, there was no understanding whether a wharfage charge would be charged or when the charge, if any, was to commence or to end. After the death of her husband and the docking of the vessel, Mrs. Isaksen was contemporaneously negotiating with Nils Sletten on a possible sale of her interest therein to Mr. Sletten, or to one of Mrs. Isaksen's sons through Mr. Sletten. Mrs. Isaksen herself, it was indicated, did not desire to operate the vessel, or be in any way responsible for its operation.

In any event, it was agreed by Mr. Sletten and Mrs. Isaksen that the vessel would leave Eirik's Dock in Wildwood, New Jersey, and be transported to Weems, Virginia. The fuel for that trip, by agreement of the parties, was and has been disbursed from the amount of the monies held by the Court. Humphreys' Railways performed certain repairs on the vessel and ultimately brought an attachment on the vessel in this matter. It is Humphreys' attachment for its repairs that ultimately brought about the sale.

After the attachment, Eirik's made a claim for the fuel and claimed $100 per day wharfage charges running from April 12, 1983, the day of Mr. Isaksen's death, until the NILS S left for Weems, Virginia on August 5, 1983. In addition, Eirik's has also claimed 24 percent interest under "custom and usage" for the account since the facility claims it is beyond thirty days overdue.

Mr. Kirkeberg testified that a "laid up" vessel was essentially occupying valuable dock space which would otherwise yield profits. Further, he asserted that no other dock wanted to accept a "laid up" vessel such as the NILS S at any fee because it was a losing proposition. Mr. Kirkeberg testified that in Wildwood, New Jersey, if a vessel wanted to be laid up for one day, and occupy space which would otherwise be working, that it would likely be charged $100 for that particular day. There was no testimony concerning any other normal rates other than that offered by Mr. Kirkeberg which discussed $100 a day for a working day. The testimony overall indicated that there were five working days in a week insofar as wharfage is concerned.

■ Wharfage contracts are within the maritime jurisdiction of this Court, *Ex Parte Easton*, 95 U.S. (5 Otto) 68, 24 L.Ed. 373 (1877), and subject to a maritime lien under the general maritime law and the statutory provisions of 46 U.S.C. § 971; *The Western Wave*, 1935 A.M.C. 985, 77 F.2d 695 (5th Cir.1935), *cert. denied*, 296 U.S. 633, 56 S.Ct. 156, 80 L.Ed. 450 (1935); 1935 A.M.C. 1444; *The William Leishear*, 21 F.2d 862 (D.Md.1927). 46 U.S.C. § 971 states:

Persons entitled to lien. Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit *in rem*, and it shall not be necessary to allege or prove that credit was given to the vessel.

There was no oral or written contract between the NILS S and Eirik's. On April 12, 1983, Eirik was performing a service out of good neighborliness to his friend and his wife's nurse. On a previous occasion, Eirik had kept the NILS S for a period of approximately two months without any charges whatsoever even though the vessel was not then operating out of his wharf. In this case, the Court finds that Eirik intended to allow the NILS S to remain for a reasonable period of time without charge. By virtue of the previous conduct of the parties, the Court finds that a reasonable period of time without charge would be approximately two months until a period beginning June 12. The Court finds as a fact that Eirik did not expect payment nor did the widow expect to pay, at the inception of the arrangement.

■ Any contract between the parties would be one implied at law under a *quantum meruit* theory. Ordinarily, when one person renders services for another which are requested and accepted by him, the law creates an obligation, which is an implied-in-law contract, on his part to pay a reasonable compensation, unless something in the relationship of the parties indicates otherwise. *Marine Development Corp. v. Radak*, 225 Va. 137, 300 S.E.2d 763 (1983); *Burke v. Gale*, 193 Va. 130, 67 S.E.2d 917, 919 (1951). The crux of a *quantum meruit* cause of action lies in the unjust enrichment of one party. *Kern v. Freed Co.*, 224 Va. 678, 299 S.E.2d 363, 363–64 (1983). Merely rendering services alone does not create a contract implied-in-law, nor is such a contract implied when one officiously confers benefits upon another. *Weitzel v. Brown-Neil Corp.*, 152 F.Supp. 540, 549 (N.D.W.Va.1957); *United States v. Lias*, 154 F.Supp. 955, 958 (N.D.W.Va.1957). See also Annot. 54 A.L.R. 548. Thus, a promise will not be implied by law to pay a lifelong friend and neighbor for unsolicited services as a nurse during a last illness. *Teawalt v. Ramey*, 103 Va. 42, 48 S.E. 505 (1904). Further, even though one may have benefitted from another's services, the latter cannot recover unless he can

show sufficient additional facts that imply a promise to pay. *Mullins v. Mingo Lime Co.,* 176 Va. 44, 10 S.E.2d 492, 494–95 (1940).

■ This Court finds as a fact that the plaintiff gave and the widow expected gratuitous services for a reasonable time, without compensation under the circumstances of this case at least until June 12. On the 12th of June, the NILS S was accruing benefits and was the recipient of valuable services for which in equity it should pay. Certainly, it is not to be expected that Eirik's would continue indefinitely to provide free services of a valuable nature to this vessel, as it had to be moored at some place or spot, and the widow's testimony buttresses this fact. The Court finds that weekends, that is, Saturdays and Sundays, would not be reasonably charged since no business was conducted then and the testimony during this trial indicates that a five-day week is generally considered a work week even in the fishing industry. Eirik Kirkeberg testified that the charge levied was based on what the dock space would yield in the way of fishing business on a one day basis. This Court has no other basis upon which to find a charge other than the $100 a day for an average working day over a 5 day weekly period, which is $500.00 per week, or a total of $4,000.00 for 8 weeks.

■ Eirik's has also claimed 24 percent interest under "custom and usage" for the account since it was over thirty days overdue. Insofar as any claim for the 24 percent interest is concerned, the law does not imply interest unless one bargains for interest. Normally, for interest to be charged, there must be an understanding prior to the time service is rendered for payment at a particular time and rate. The first bill was sent in this case upon the attachment of the vessel. There was no understanding with regard to an interest payment, much less payment at a particular time. At best there was an implied contract that valuable services may have been rendered after June 12, and payment would therefore be received out of the vessel itself on some occasion in the future. Since no interest was contemplated or considered in any way by any of the parties, it cannot be determined when to start implying such even if awarded. Moreover, this Court finds as a fact that the plaintiff is entitled to no interest.

## II. HUMPHREYS' CLAIM

While the NILS S was at Eirik's Dock, Mrs. Isaksen and Mr. Sletten arrived at a decision to transport it to Weems, Virginia, where Humphreys was to carry out a conversion of the vessel from a clamming vessel with some scalloping capabilities, to an exclusively scalloping vessel. There was no agreement nor any plan by Mrs. Isaksen and Mr. Sletten to keep the NILS S as a "going concern". Mrs. Isaksen desired to sell the vessel and Mr. Sletten desired to get the vessel into operation. Mrs. Isaksen thought that Mr. Sletten was purchasing the vessel. Indeed, Mr. Sletten's conduct was such as to indicate that he was going to purchase the vessel, although no contract was ever entered into between the parties because specific terms were never agreed upon. In any event, certain repairs were made to the NILS S by Humphreys which benefitted the vessel.

On November 29, 1983, the Eastern District of Virginia-Richmond Division entered an order appointing Humphreys as substitute custodian of the NILS S on its libel of the vessel. On filing its petition to serve as substitute custodian, Humphreys averred, *inter alia,* that it had "adequate facilities and supervision for the proper safekeeping of the vessel ..." and agreed to "release the U.S. Marshal from any and all liability and responsibility ..." for such wharfage. Humphreys sought $200 per day, seven days a week, from the order's entry until the vessel's sale, asserting that the U.S. Marshal would charge "at least $180 per day." Subsequently, the matter was transferred to the Eastern District of Virginia-Norfolk Division, on January 6, 1984.

In the final pretrial order and at trial, several of the plaintiffs attacked the $200

per day substitute custodial fee claimed by Humphreys. The fee was labeled as unreasonable and excessive as the custodial service claim spanned 152 days and the claim totaled $30,400. On the other hand, Humphreys defends its wharfage charges on the grounds that (1) a federal district court order already authorized the charge, and (2) the plaintiffs received a benefit from Humphreys' protective services, never complained initially, and thus have waived their objections and are therefore estopped.

### A. *Services Rendered*

Reviewing the relevant events, the Eastern District of Virginia, Richmond Division, acting on Humphreys' petition, entered its order on November 29, 1983, permitting $200 per day for the substitute custodian. The petition asserted that the U.S. Marshal's own costs would run "at least $180 per day", and that their costs of $200 per day relieved the Marshal of all responsibility and were allegedly a bargain.

The statute which permits the U.S. Marshal's custodial fees, and accordingly any substitute custodial charges, states:

On the following fees of United States marshals shall be collected and taxed as costs, except as otherwise provided:

\*   \*   \*   \*   \*   \*

For the keeping of property attached (including boats, vessels, or other property attached or libeled) actual expenses incurred, such as storage, moving, boat hire, or other special transportation, watchmen's or keepers' fees, insurance, and $3 per hour for each deputy marshal required for special services, such as guarding, inventorying, moving, and so forth. The marshals shall collect, in advance, a deposit to cover the initial expenses for such services and periodically thereafter such amounts as may be necessary to pay such expenses until the litigation is concluded.

28 U.S.C.S. § 1921 (1979). *See New River Yachting Ctr., Inc. v. M/V Little Eagle II,* 401 F.Supp. 132, 135 (S.D.Fla.1975). It is apparent the custodian may be compensated for "actual expenses incurred" and the

district court, applying equitable principles in admiralty routinely looks into the reasonableness of maritime claims in such an *in rem* action.

Evidence in this case revealed that $22 per day for a five-day week ($110.00 per week) was charged by Humphreys for the wharfage of vessels in general, and for the NILS S itself prior to the entry of the court order. This $22 per day fee included water, electricity, watchman services, and the insurance required by Humphreys. After the court order allowing $200 per day, there was no additional insurance coverage, watchmen or the like provided to the boat, according to the Humphreys' manager. (See Deposition of George Thomas Edwards, May 24, 1984, at pp. 22–24). This Court finds as a fact that no service of any kind, nature or description was rendered to the NILS S subsequent to November 29, 1983, the date of attachment, that was not rendered prior to the attachment of the vessel. Humphreys' manager attempted to testify to some different services contrary to his prior deposition. He testified at the hearing that a dockside pump was present; however, the vessel did not leak, and the only water leakage would have come through the hatches if there were open hatches. He testified that on occasion, he may have pumped out the vessel. However, the vessel was equipped with automatic pumps which would have pumped out any water that came into the hatches. The Court rejects the testimony by Humphreys' manager about the necessity to pump water, and finds as a fact that no services of any kind, nature or description were rendered to the vessel after November 29, 1983, that were in any way different from the services being rendered before the vessel was attached. Any pumping of water was clearly unnecessary as the vessel's own pumps could take care of any rain water.

### B. *Reasonableness, Waiver, Estoppel*

█ The amount of any wharfage fees declared as an administrative expense must be reasonable. *See New York Dock Co. v.*

*S.S. Poznan,* 274 U.S. 117, 122–23, 47 S.Ct. 482, 484–85, 71 L.Ed. 955 (1927). No parties in this matter, including Humphreys itself, introduced evidence that $200 per day was a reasonable charge for wharfage in Weems, Virginia. The Court, *sua sponte,* attempted to look into the justification of a nearly 1000% increase in wharfage charges upon entry of a court order from $110 to $1,400 per week.

Apparently, Humphreys was prepared to literally "bank" on the validity of the court order and forego entry of "reasonableness" evidence at trial. The doctrine of waiver was asserted by Humphreys because at no time for the months prior to the sale of the NILS S did the complaining parties raise the issue of excessive fees while receiving the benefits of the substitute custodian's protection. *See P.C. International, Inc. v. Vessel SUSAN,* 1980 A.M.C. 2062, 2069 (S.D.Fla.). For support of its waiver argument, Humphreys' reliance on *United Virginia Bank/Citizens and Marine v. Oil Screw SEA QUEEN,* 1971 A.M.C. 1880 (E.D.Va.1971) (MacKenzie, D.J.) is not well taken. There, the court dealt with a belated attack against the allegedly negligent substitute custodian's arrangement, as the plaintiff argued that the U.S. Marshal should have retained custody of the vessel. The Eastern District of Virginia revealed a sensitivity to high wharfage fees in noting that the Marshal would have required $75 per day whereas the substitute *only sought $18 per day.* Since the substitute fee and arrangement was completely reasonable under the circumstances the court repelled the late attack. *Id.*

▮▮▮▮ The Court agrees that the complaining parties could have challenged the substitute custodian wharfage fees at an earlier date. Nonetheless, sitting by idly and enforcing exorbitant wharfage fees is not a proper course of conduct for any court. Humphreys' itself was forwarding bills monthly to the defendants as seen in the exhibits. The monthly billing indicated a $22.00 per working day, $110.00 per week charge, for custodial care of the vessel. A regular customer would not have expected

to owe more than they were billed. Here, the owners would have not have expected that Humphreys was actually going to claim $1,400 a week when it was concurrently billing $110.00 a week for the same services. Certainly Humphreys cannot claim a waiver by the intervenors when its own conduct was such as to completely mislead any normal recipient of such bills into believing that Humphreys itself was only claiming $110.00 weekly, instead of $1,400.00 weekly. This Court finds that no waiver nor any estoppel has been shown by Humphreys as to the vessel or its owners and indeed, this Court holds that the owners have not relinquished their right to argue that the Humphreys' wharfage charges were excessive under the circumstances of this case. The wharfage charges were attacked at the final pretrial conference and at trial. Accordingly, the Court has examined the reasonableness of the wharfage charges sought by Humphreys.

One of the parties called attention to *Pouch Terminal v. M/V Atra, et al.,* 1982 A.M.C. 2268 (S.D.N.Y.1982). This case involved a challenge against substitute custodian wharfage charges rendered to a vessel of indeterminate length. The court there reviewed the charges and stated:

> The parties to this action have registered several objections to the amounts claimed by Pouch. The principal objection is to the reasonableness of the $600 per day rate. Certain claimants argue that, although this rate was established by contract before the Atra was seized, the contract is not controlling on the issue of reasonableness. It is urged that $100 per day would be more reasonable because that is what the Port Authority of New York and New Jersey charges for vessels of a size comparable to the Atra's. Claimant crew members argue that wharfage fees for a comparable vessel docked in Brooklyn would cost only $260 per day and that therefore Pouch should receive less than half of what it is asking. Finally, it is argued that Pouch has not submitted proof of the additional

guard services which it rendered between September 11 and 17.

\*    \*    \*    \*    \*    \*

It appears to me that Pouch should be entitled at the very least to that rate which it had established prior to the arrival of the Atra. That rate is $500/day for a vessel of the size of the Atra. This court is not bound by the $600 per day contractual rate.

*Id.* at 2274. The salient comment of the New York court regards the reduction of the wharfage charge to the amount normally charged for a vessel of similar size.

██ This Court finds as a fact that a normal, fair, reasonable rate for wharfage and custodial expenses that Humphreys would charge would be that which Humphreys itself set. That fee is $22 a day per work day or $110 per calendar week. A fee of $1,400 per week in rural Weems, Virginia is in no way fair nor reasonable nor will it be condoned or accepted by the Court. The custodial fees requested are such as to shock the conscience of this Court under the circumstances of this case. This is not to say that such fees would not be reasonable in another case with different circumstances.

Accordingly, Humphreys is entitled to thirty-six (36) weeks of custodial fees at $110.00 a week, or the sum of $3,960.00 as custodial fees.

Thus, it is hereby ORDERED Eiriks' shall receive $4,000 for wharfage and Humphreys shall receive $3,960.00 for custodial fees.

IT IS SO ORDERED.