**Samson and Elizabeth YAKUBU, Plaintiffs,**

v.

**ATLAS VAN LINES, Defendants.**

**No. CIV.A.6:03 CV 00012.**

United States District Court,
W.D. Virginia,
Lynchburg Division.

July 16, 2004.

---

James Frederick Watson, Caskie & Frost, David Byron Bice, Lynchburg, VA, for Plaintiff.

Jane Siobhan Glenn, Melissa Walker Robinson, Mark K. Cathey, Jones, Glenn & Robinson, PLC, Roanoke, VA, for Defendants.

## MEMORANDUM OPINION

MOON, District Judge.

The plaintiffs, Samson and Elizabeth Yakubu ("Plaintiffs") commenced this action in the Circuit Court for Bedford County, Virginia, naming Atlas Van Lines and Knight Moving and Storage as the defendants. The case was removed to this Court on February 27, 2003 and, on July 18, 2003, the Court dismissed Knight Moving and Storage as a party to this lawsuit. Thus, the sole remaining defendant was Atlas Van Lines ("Defendant"). A bench trial was conducted on January 6, 2004.

## I. FINDINGS OF BASIC FACT AS TO PLAINTIFF'S CLAIM

### A. The Initial Meeting

1. Defendant is, and all times relevant to this action was, a professional moving company engaged in the business of moving household goods in interstate commerce.

2. In May of 2001, Plaintiffs contacted Defendant, as well as another moving company, seeking their potential services to move their family from Forest, Virginia to Plano, Texas.

3. The first face-to face meeting between the parties occurred in May of 2001 when Ed Landis, Defendant's agent, came to Plaintiffs' home to provide an estimate for the move.[1]

4. As a result of that meeting,[2][3] a written Order/Estimate was prepared and

---

**1.** It is disputed whether both Plaintiffs were present at that meeting or whether only Mrs. Yakubu met with Ed Landis. Mr. Landis contends that he met only with Mrs. Yakubu when he went to Plaintiffs' house to look at the household goods that Plaintiffs intended to move and to provide an estimate in connection with that move. Tr. Tran. 106:17–25; 107:1–7. Mr. Landis maintains that he never

met or had any discussions with Mr. Yakubu. Id. Mr. Yakubu was unclear as to whether he was present at the initial meeting with Mr. Landis. Tr. Tran. 4:1–9.

**2.** The facts surrounding the initial meeting with Mr. Landis are also disputed. According to Plaintiffs, Defendant was clearly informed that they wanted a quote for the cost to move

mailed to Plaintiffs (the "Estimate").[4]

### B. The Estimate

5. Two boxes appear at the top of the Estimate. Next to the first box is the term "Non-binding." Next to the other box is the term "Binding." Neither box is checked.

6. The top portion of the Estimate also includes a chart detailing the "Estimated Cost of Containers, Packing and Unpacking Services." This chart was completed by Defendant to include: (i) the estimated number of containers and the corresponding cost; (ii) the estimated number of containers to be packed and the corresponding cost and (iii) the estimated number of containers to be unpacked and the corresponding cost. Below this section, on the right-hand side of the form, are two columns.

7. The first column, untitled, lists a total weight in pounds of 19,000, a transportation charge of $16,155.00, an additional transportation charge of $522,50, a fuel surcharge of $646.20, a charge for one flight of stairs of $323.00, an appliance charge of $130.40 and a piano charge of $95.65, all totaling $17,872.75. The amount of $17,872.75 is also reflected in the Estimate Summary, as noted in item 9, below. The next column is entitled "Non-binding Items." No charges are included within this section. The initials W/A appear next to the first item "Valuation."

8. On the lower right hand corner of the Estimate, the amount of $9,694.07 is filled in under the words "Total Estimated Charges." Under that box is another box entitled "Binding Charges." This box was left blank.

9. Also in the lower right portion of the Estimate is a column entitled "Estimate Summary." This column contains the following descriptions and charges:

| | | |
|---|---|---|
| (i) | Cost of Containers: | $ 2,492.55 |
| (ii) | Cost of Packing: | $ 2,069.45 |
| (iii) | Cost of Unpacking: | $ 109.60 |
| (iv) | Total Line 11: | $17,872.75 |
| (v) | Subtotal Lines a thru d: | $22,544.35 |
| (vi) | BLD 157 | ($12,850.28) |
| (vii) | Subtotal e and f: | $ 9,694.07 |

all of their household goods. Tr. Tran., 65:7–20. Plaintiffs maintain that, according to Mr. Landis, the estimate would reflect the cost to "move everything." Id. Plaintiffs add that Mr. Landis never told them that the estimate was not binding or that the cost of the move could go up or down. Id.

3. According to Mr. Landis, Mrs. Yakubu was provided with the same "complete moving package," that he provides to all his customers. Tr. Tran. 107:9–10. Mr. Landis also explained to Mrs. Yakubu that the cost of the move was derived from three factors: (i) the units of packing, (ii) the miles traveled and (iii) the weight on the truck. Tr. Tran. 107:9–17. He advised Mrs. Yakubu that Plaintiffs could reduce the cost of their move by reducing the number or weight of household goods moved by Defendant. Tr. Tran. 107:14–17. Finally, Mr. Landis claims that Mrs. Yakubu advised him that certain items were going to remain in Lynchburg or would not be moved by Defendant. Defendant states that Mrs. Yakubu declined to show Mr. Landis one whole room of items, explaining they would not be part of the move. Def. Proposed Finding of Facts, ¶¶ 10–11. According to Mr. Landis, when Defendant went to actually complete the move, "there was a lot more than anticipated." Tr. Tran. 111:14–15.

4. Defendant claims that as a result of the meeting, the Estimate was prepared and mailed to Plaintiffs with a letter explaining that they would need to decide on the insurance desired and that the Estimate would need to be signed and returned. Plaintiffs returned the Estimate and initialed the portions that acknowledged the terms of the agreement between the parties. Def. Proposed Finding of Facts, ¶¶ 12–14. Plaintiffs claim that they contacted Defendant by telephone and never signed the Estimate. Plaintiffs further claim that in the course of their discussions with Defendant, they were never advised as to the dispute resolution program. Tr. Tran. 16:1–19.

10. The bottom of the form contains a line for the customer's signature.[5]

11. The lower right-hand section of the Estimate features a box next to a sentence that reads as follows: "I have received a copy of Publication OE—100 'Your Rights and Responsibilities When You Move,'" and a summary of Atlas' Dispute Settlement Program.[6]

12. It is disputed whether Defendant clearly identified the shipment and all services to be provided pursuant to the Estimate.[7]

13. On the reverse side of the Estimate provides a form entitled "Table of Measurements." This form was left blank.[8]

### C. The First Shipment

14. Plaintiffs' next contact with Defendant occurred on July 12, 2001 when Defendant's agent, driver Charles Hearn, went to Plaintiffs' home in Forest, Virginia to pack and load Plaintiffs' household goods.[9]

15. Prior to departure, Mr. Hearn prepared and presented a single Bill of Lading for the goods to be shipped. The Bill of Lading was blank with respect to the cost of the move.[10, 11]

---

5. It is disputed whether Plaintiffs signed the Estimate. The copy provided by Plaintiffs is not signed. The copy provided by Defendant is initialed at the bottom. Defendant claims that Mrs. Yakubu initialed the Estimate before mailing it back to Atlas.

6. It is also disputed whether Plaintiffs were advised of Defendant's dispute resolution program. The copy of the Estimate that was provided by Plaintiffs did not have this box checked. The copy of the Estimate that was provided by Defendant did have this box checked.

7. Defendant argues that the Estimate was sufficiently detailed in that it "was described as items of the plaintiffs, weighing approximately 19,000 pounds, going from Virginia to Texas and identified in detail the number of boxes, type and size and the cost of the containers." December 18, 2003 Def. Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment, pp. 7–8. Plaintiffs counter that the Estimate was not sufficiently detailed, as it failed to identify any of the furniture, household goods, accessories or other property taken into consideration in preparing the estimate. Plaintiffs further point out the Table of Measurements form, provided on the reverse side of the Estimate, was left blank. This form, according to plaintiffs, could have provided a convenient place in which to describe the shipment. December 22, 2003 Plaintiffs' Memorandum in Reply to Defendant's Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment, p.5.

8. Defendant counters that the fact that the Table of Measurements was not filled out supports the proposition that Plaintiffs were given a non-binding Estimate. If the Estimate were binding, Defendant would be required to complete this form to ensure that the shipper does not add items to the shipment after the binding estimate has been provided. If the shipper were to add additional items to a binding Estimate, Defendant would not get paid for carrying the additional items. With regard to a non-binding Estimate, if the weight or volume of goods transported is greater than the estimate this will be reflected appropriately and Defendant can charge for the actual weight of the goods transported. December 18, 2003 Def. Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment, p. 8.

9. There are significant factual disputes with regard to what transpired between Defendant and Plaintiffs in connection with the interstate move and the proposed interstate move of certain of their goods from Virginia to Texas.

10. According to Defendant, Plaintiffs did not tender all their goods to driver Charles Hearn. Defendant contends that on July 12, 2001, Mrs. Yakubu indicated that there were many items she did not want Defendant to load, either because they were not taking them to Texas or they needed them left behind for the present time. On July 13, 2001, when Defendant's agent Mr. Hearn finished packing all the items, he presented Mrs. Yaku-

16. On July 18, 2001, Defendant's truck, operated by Charles Hearn, arrived at Plaintiffs' new residence in Plano, Texas.

17. On July 18, 2001, after unloading the truck, Defendant had Mrs. Yakubu sign the Bill of Lading.

18. On July 18, 2001, Mr. Hearn advised Plaintiffs that the cost of the move was $12,345.57 and further stated that he could not unload their household goods unless they immediately paid Defendant $10,663.00, an amount equal to 110% of the $9,694.07 estimated charges.[12]

19. The Plaintiffs also agreed to pay the remaining balance within thirty days.

20. Subsequently, Plaintiffs paid Defendant an additional $1,846.92 after Defendant, by letter dated August 16, 2001, advised plaintiffs that the cost was not $12,345.57, but $12,509.92.

## D. The Second Shipment

21. A second truck also left Plaintiffs' home sometime between July 12, 2004 and July 14, 2004. These goods were taken to Defendant's office in Lynchburg, Virginia, where they were ultimately placed in storage.[1314]

22. Defendant never transported Plaintiffs' remaining household goods to Plano, Texas.[15]

---

bu with a Bill of Lading which identified the items that were loaded on the truck. After Mrs. Yakubu signed the Bill of Lading, Mr. Hearn drove the truck back to Knight Moving and Storage.

11. Plaintiffs provide a different version of the events that transpired. According to Plaintiffs, on July 12, 2001, Defendant went to their home in Forest, Virginia and inventoried all of their household goods. Plaintiffs' Proposed Findings of Fact, ¶ 11. On July 13, 2001, Defendant loaded said household goods onto two vehicles. *Id.* ¶ 12. The Bill of Lading prepared that day was signed by Mrs. Yakubu, although the Bill of Lading did not show the cost of the move or any estimated charges that were clearly designated "nonbinding." *Id.* ¶¶ 13–14. This factual finding, however, differs slightly from Plaintiffs' December 3, 2003 Motion for Summary Judgment, p. 2, which states that, on July 12, 2001, Defendant went to Plaintiffs' home in Forest, Virginia and "loaded all of the Yakubus' household goods onto its trucks."

12. Mr. Hearn, Defendant's agent, stated that he explained to Plaintiffs that the weight of the estimate was more than the weight of the shipment and that this was the primary reason for the difference between the actual charges and the estimated charges. Affidavit of Charles A. Hearn, ¶ 5, Exhibit 1 to Defendant's December 18, 2003 Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment.

13. According to Mr. Hearn, after the first truck was loaded, he was informed that Plaintiffs changed their minds and now wanted the remaining items loaded and transported to Texas. Mr. Hearn went back to Plaintiffs' residence on July 14, 2001, and loaded the remaining items. These items were loaded on a second truck and, Defendant maintains, were not included on the Bill of Lading which was issued for the first shipment. Defendant further alleges that, at this point, Plaintiffs were informed that there would be additional charges for those items which they now had requested be transported to Texas because those items were not included on the Estimate or the Bill of Lading. December 18, 2003 Def. Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment, pp. 2–3.

14. For Plaintiffs' version of the events surrounding the household goods that were loaded onto the second truck, *see infra* note 11.

15. According to Mr. Hearn, when Plaintiffs inquired as to the delivery of their remaining items, they were advised that the remaining items were a separate shipment and were not included in the Bill of Lading or the charges for the first shipment. Mr. Hearn stated that he advised Plaintiffs that they would be required to pay at delivery in order to have those items shipped to Texas. Mr. Hearn maintained that he explained to Plaintiffs that the 110% they had just paid related only to the items on the first shipment. At that point,

23. Defendant kept the goods in storage until Plaintiffs came to pick them up. Ultimately, Defendant agreed to waive its claim for $7,234.09 in storage fees and released Plaintiffs' remaining household goods to Plaintiffs on June 6, 2002.[1617]

24. Plaintiffs submitted a written claim to Defendant on or about September 27, 2001.

25. Defendant denied Plaintiffs' claim by letter dated January 11, 2002.

26. Plaintiffs state that as a direct result of Defendant's violation of the Carmack Amendment, Plaintiffs have suffered damages in the amount of $20,000.00. Plaintiffs' Proposed Findings of Fact, ¶ 48. Plaintiffs also contend that, as a direct result of Defendant's violation of the Carmack Amendment, they have incurred costs, including reasonable attorney fees, in excess of $15,000.00.

27. Plaintiffs provided an itemized list for estimated costs incurred as a result of Defendant's failure to deliver all of their household goods that totaled $16,287.00. In support of their claim, Plaintiffs have provided no receipts for replacement items

Plaintiffs said they no longer wished to have Defendant deliver the second shipment. Plaintiffs advised Mr. Hearn that they would get a U–Haul and even asked Mr. Hearn if he would drive the U–Haul to Texas for them. Mr. Hearn provided Plaintiffs with his home telephone numbers and told them he was willing to undertake such a move if they could arrive at an acceptable contract for his services. Plaintiffs never contacted Mr. Hearn. Affidavit of Charles A. Hearn, ¶ 6, Exhibit 1 to Defendant's December 18, 2003 Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment; Def. proposed Findings of fact, ¶ 25. Plaintiffs maintain that they never advised Defendant that they did not want all of their goods delivered. Tr. Tran. 80:19–21.

16. It is Plaintiffs' contention that all of their household goods were picked up by Defendant on July 12, 2001. Plaintiffs' further allege that they did not receive all of their goods until June 6, 2002, when Mr. Yakubu rented a U–Haul and picked up his goods from Defendant's agent's warehouse in Forest, Virginia. Plaintiffs' December 3, 2003 Motion for Summary Judgment, p. 5. Thus, Plaintiffs maintain that Defendant did not deliver their goods with reasonable dispatch. Plaintiffs support their contention with the following documents. First, Plaintiffs note the original Estimate identified costs for twenty-one mattress cartons, although twenty-one mattresses (or box springs) were not delivered to Texas. Tr. Tran. 57:6–11; Plaintiffs' December 22, 2003 Memorandum in Reply to Defendant's Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment. Second, Plaintiffs point to an email in which Defendant refers to the items placed in storage as "overflow." Exhibit H to Plaintiffs' December 3, 2003 Motion for Summary Judgment. Third, although Plaintiffs agree that Mrs. Yakubu signed the Bill of Lading on July 13, 2001, Plaintiffs contend that no notification was provided that the items loaded on Defendant's truck included more than contemplated in the original Estimate. Tr. Tran., 80:25; 81:1–11.

17. Defendant counters that every item that was shipped to Texas was covered under the original Estimate and the Bill Lading. The Plaintiffs cancelled the second interstate shipment before a second Bill of Lading could be prepared. Defendant further maintains that the day of the initial meeting, upon which the Estimate was prepared, Mr. Landis viewed twenty-one mattresses and box springs in Plaintiffs' Forest, Virginia home. Tr. Tran. 114:25; 115:1–8. Although Mrs. Yakubu did not specify that eight mattresses or box springs were not to be moved, Mrs. Yakubu did explain that a number of items were not to be moved to Texas. Tr. Tran. 115:3–8; 111:9–15. Defendant also alleges that an inventory was prepared for the first shipment of goods to Texas. Tr. Tran., 129:20–25. A second inventory was prepared for the items that were not initially scheduled to be moved and that were ultimately taken to Defendant's warehouse. Tr. Tran., 130:21–25. Some of the household goods, such as mattresses, that was originally placed on the first inventory, were taken off by Mrs. Yakubu. Tr. Tran., 135:1–15.

purchased or evidence from any employer regarding any lost wages.

28. Defendant provided an original Estimate to Plaintiffs of $9,694.07. The final cost for moving the household goods that arrived in Plano, Texas on July 18, 2001, was $12,509.92. The difference between the Estimate and the final cost was $2,815.85.

## II. CONCLUSIONS OF LAW

1. An action for damages lies under the Carmack Amendment where goods are not transported with reasonable dispatch. *Southeastern Express Co. v. Pastime Amusement Co.*, 299 U.S. 28, 29, 57 S.Ct. 73, 81 L.Ed. 20 (1936) (citing *New York, Philadelphia & Norfolk Railroad v. Pennsylvania Produce Exchange*, 240 U.S. 34, 38–39, 36 S.Ct. 230, 60 L.Ed. 511 (1916)) ("The statute thus applies to damages caused by delay in making delivery."); *Richter v. North American Van Lines, Inc.*, 110 F.Supp.2d 406, 412–13 (D.Md. 2000) ("[A]lthough the Carmack Amendment refers to compensation for 'loss or damage' to goods, it also allows recovery for unreasonable delay in the delivery of goods, even if not lost or damaged."). Thus, Plaintiffs have stated a viable cause of action under the Carmack Amendment.

2. Based on the weight of the evidence, it appears that there were two shipments. The first was the shipment of household goods that arrived at Plaintiffs new residence in Plano, Texas on July 18, 2001 (the "First Shipment"). The second shipment consisted of the household goods that were loaded onto Defendant's truck on July 14, 2001 and that were ultimately stored in Defendant's warehouse.

3. The First Shipment does not appear to have been dispatched with "unreasonable delay" in violation of the Carmack Amendment. Nevertheless, federal regulations that implement the Carmack Amendment provide for a carrier to issue either a "binding estimate," *see* 49 CFR § 375.3(a)(2001), or a "non-binding estimate," *see* 49 CFR § 375.3(b) (2001).

4. A binding estimate must be clearly indicated as such on its face. 49 C.F.R. § 375.403(a)(3). A binding estimate must clearly describe the shipment and the services provided. 49 C.F.R. § 375.403(a)(4). If it appears that an individual shipper has tendered additional goods or requires additional services that were not identified in the binding estimate, the carrier is not required to honor the estimate. 49 C.F.R. § 375.403(a)(5). A carrier who services the new shipment must (i) reconfirm the binding estimate, (ii) negotiate a revised binding estimate or (ii) agree with the shipper in writing that the original estimate was not binding. *Id.* Once the shipment is loaded, a carrier who fails to comply with the items noted above may not collect more than the original binding estimate. 49 C.F.R. § 375.403(a)(6).

5. A non-binding estimate must provide a reasonably accurate estimate of the weight or volume of the shipment and services. 49 C.F.R. § 375.405(b)(1). The non-binding estimate must be clearly indicated as such on its face. 49 C.F.R. § 375.405(b)(5). A non-binding estimate must clearly describe the shipment and the services provided. 49 C.F.R. § 375.405(b)(6). If it appears that an individual shipper has tendered additional goods or requires additional services that were not identified in the non-binding estimate, the carrier is not required to honor the estimate. 49 C.F.R. § 375.405(b)(7). A carrier who services the new shipment must (i) reconfirm the binding estimate or (ii) negotiate a revised binding estimate. *Id.* Once the shipment is loaded, a carrier who fails to comply with the items noted above has reconfirmed the original non-

binding estimate. 49 C.F.R. § 375.405(b)(8).

■ 6. Where there is an ambiguity in a contract, the question of interpretation is, generally, a question of fact to be resolved by the finder of fact. *See Martin Marietta Corp. v. INTELSAT*, 978 F.2d 140, 143 (4th Cir.1992) ("[T]he construction of ambiguous contract provisions is a factual determination."). In cases of contract ambiguity the Fourth Circuit has stated: "Only an unambiguous writing justifies [judgment as a matter of law] without resort to extrinsic evidence, and no writing is unambiguous if 'susceptible of two reasonable interpretations.' " *World–Wide Rights Ltd. Partnership v. Combe, Inc.*, 955 F.2d 242, 245 (4th Cir.1992) (quoting *American Fidelity & Cas. Co. v. London & Edinburgh Ins. Co.*, 354 F.2d 214, 216 (4th Cir.1965)). In addition, "the doctrine of *contra proferentum* (ambiguous contractual provisions are to be construed against the drafter) can be used as a tie-breaker to resolve any arguable contract ambiguity." *Zenith Data Systems Corp. v. Electronic Data Systems Corp.*, 131 F.3d 139, 140 (4th Cir.1997) (unpublished).

7. Although it appears that Plaintiffs did not completely recall or understand the terms of the original Estimate, Defendant did not complete the Estimate in a manner that was clear and unambiguous. Thus, the Estimate shall be construed as binding and Defendant is directed to repay Plaintiffs $2,815.85, the difference between the Estimate and the actual cost of moving the household goods that arrived in Texas on July 18, 2001.

■ 8. Quantum meruit (translated: "as much as deserved") is an equitable doctrine premised on the notion that one who benefits from the labor of another should not be unjustly enriched. *Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Capital Corp.*, 961 F.2d 489, 490–91 (4th Cir.1992) (citing *Kern v. Freed Co.*, 224 Va. 678, 299 S.E.2d 363, 363–64 (1983)). To establish a right to relief on this basis under Virginia law, the claimant must show that (i) he rendered valuable services, (ii) to the defendant, (iii) which were requested and accepted by the defendant, (iv) under such circumstances as reasonably notified the defendant that the claimant, in performing the work, expected to be paid by the defendant. *Id.* at 491, 299 S.E.2d 363 (citing *Humphreys Railways, Inc. v. F/V Nils S.*, 603 F.Supp. 95, 98 (E.D.Va.1984)) (other citation omitted). Even if the Court found an implied contract underlying the Second Shipment, the evidence proves that Plaintiffs intended to cancel that shipment. Moreover, Plaintiffs provided no receipts or documentation in support of their damages and Defendant waived storage fees for the time the household goods contained in the Second Shipment were stored in its warehouse. Thus, the Court finds no damages applicable to the Second Shipment.

■ 9. Under the Carmack Amendment, 49 U.S.C. § 14706, there is no provision for attorney fees. *See Collins Moving & Storage Corp. of South Carolina v. Kirkell*, 867 So.2d 1179, 1183 (Fla.Dist.Ct. App.2004). Section 14708 is a separate statutory section provision entitled "Dispute settlement program for household goods carriers." *Id.* Under this section, a carrier is required to provide notice of its arbitration program. 49 U.S.C. § 14708(a). Attorney fees may be awarded to the shipper only if: (1) the shipper submits a timely claim to the carrier; (2) the shipper prevails in the court action; and (3) a decision resolving the dispute was not rendered through arbitration within the period provided or an extension of such period, or the court proceeding is to enforce a decision rendered through arbitration and is instituted after the period

for performance under such decision has elapsed. 49 U.S.C. § 14708(d)(1)-(3). Thus, Section 14708(d)(1)-(3) applies only when a party has initiated its provisions in connection with dispute resolution and is inapplicable here. *See Collins Moving & Storage,* 867 So.2d at 1183 ("The provisions authorizing an award of attorney's fees under section 14708 would come into play only in a case in which a party has invoked the alternative dispute resolution provisions of section 14708.").

10. Nevertheless, a carrier who fails to provide the required notice of its arbitration program may be liable to a shipper for attorney fees. *See Ward v. Allied Van Lines, Inc.,* 231 F.3d 135, 141 (4th Cir.2000) (citing 49 U.S.C. § 14708(b)(2)("A carrier of household goods is now required to offer neutral arbitration as a means of settling these disputes, and the carrier must give the shipper notice of the availability of arbitration 'before such goods are tendered to the carrier for transportation' ")).

11. The decision in *Ward* was controlled by the fact that the shipper was without knowledge of the arbitration option. *See Collins Moving & Storage,* 867 So.2d at 1183. Similar to *Collins Moving & Storage,* Plaintiffs were aware of the availability of arbitration as an alternate dispute resolution option, notwithstanding Defendant's alleged failure to provide such notice. Plaintiffs requested attorney fees in their January 29, 2003 Motion for Judgment and sought attorney fees pursuant to 49 U.S.C. § 14708 in their December 3, 2003 Motion for Summary Judgment. There is no showing of prejudice to Plaintiffs. The provision authorizing an award of attorney fees under section 14708 applies only in a case in which a party has invoked the alternate dispute resolution provisions of section 14708. *Id.* In this case, neither of the parties did so and,

accordingly, section 14708 is not applicable. *Id.* Here, Plaintiffs acknowledged the arbitration option, yet sought attorney fees under the federal statute without first submitting a claim through the arbitration procedure. *Id.* Their position is contrary to the terms and intent of 49 U.S.C. § 14708, and is unsupported by any authority. *Id.*

12. The Carmack Amendment precludes punitive damages in an action based on the liability of a carrier for damage to goods in transit. *See Chandler v. Aero Mayflower Transit Co.,* 374 F.2d 129, 137 (4th Cir.1967) (citations omitted) ("We affirm the district court's decision that the plaintiff shipper is not entitled in this action to recover from the carrier punitive damages."); *United Van Lines v. Homburger,* 932 F.Supp. 139, 142 (W.D.N.C.1996) (citations omitted) ("It is well established that the Carmack Amendment ... preempts state law claims .... Likewise, punitive damages are precluded.").

13. The Carmack Amendment presents no barrier to the recovery of punitive damages or damages for mental distress for breach of the duty of nondiscrimination imposed by Part II of the Interstate Commerce Act, 49 U.S.C. § 316(d). *Hubbard v. Allied Van Lines,* 540 F.2d 1224, 1228–29 (4th Cir.1976) ("Defendant argues that the recovery of punitive damages in this case is foreclosed by our decision in *Chandler v. Aero Mayflower Transit Co.,* 374 F.2d 129 (4th Cir. 1967). Chandler, however, was an action based on the common law liability of a carrier for damage to goods in transit, not a discrimination case brought under 49 U.S.C. § 316(d). Thus, we do not deem it controlling here.").

14. In order to be entitled to punitive damages, plaintiffs must prove that

the defendant acted wantonly or with criminal indifference. *Id.* ("In order to be entitled to punitive damages, plaintiffs must ... prove that the defendant acted 'wantonly, or oppressively, or with such malice as implies a spirit or mischief or criminal indifference to civil obligations.'").

15. This case is not based on a claim of discrimination pursuant to 49 U.S.C. § 316(d). Moreover, the evidence does not demonstrate that the Defendant acted willfully or wantonly. Thus, punitive damages are not applicable here.

Based on the foregoing, the Court finds that the original Estimate was ambiguous, did not clearly comply with federal requirements, and accordingly, may be construed as binding. Judgment is therefore entered for Plaintiffs in the amount of $2,815.85.

The Clerk of the Court is hereby directed to send a copy of this Memorandum Opinion to all Counsel of record. The Clerk of the Court is further instructed to STRIKE this matter from the docket.