NESMITH, The CAROLINE. See Case No. 2,423.

## Case No. 10,126.

### The NESTOR.

[1 Sumn. 73.] [1]

Circuit Court, D. Maine. May Term, 1831.

JURISDICTION IN ADMIRALTY—SUPPLIES FOR FOREIGN VESSELS — SUITS IN REM—EFFECT OF CREDIT UPON LIEN—DEPARTURE OF VESSEL WITHOUT PAYMENT.

1. The admiralty has jurisdiction in rem for supplies furnished by material-men to foreign ships in our ports, to our ships in foreign ports, or in the ports of other states.

[Cited in Cole v. The Atlantic, Case No. 2,976; The Chusan, Id. 2,717; Leland v. The Medora, Id. 8,237; Macy v. De Wolf, Id. 8,933; The Alida, Id. 199; The Infanta, Id. 7,030; The Young Mechanic, Id. 18,180; The Lulu, Id. 8,604; The Grapeshot v. Wallerstein, 9 Wall. (76 U. S.) 136; The Maggie Hammond v. Morland, Id. 450; The Avon, Case No. 680; Rodd v. Heartt, 21 Wall. (88 U. S.) 597; The Albany, Case No. 131; The General Burnside, 3 Fed. 231; The Richard Busteed, Case No. 11,764; The Canada, 7 Fed. 121; Stephenson v. The Francis, 21 Fed. 717.]

[Cited in Brookman v. Hamill, 43 N. Y. 562.]

See Davis v. A New Brig [Case No. 3,643]; Harper v. A New Brig [Id. 6,090]; Read v. The Hull of a New Brig [Id. 11,609]; The Marion [Id. 9,087].

2. The giving credit for a fixed time for the supplies does not extinguish the lien for the supplies; nor the allowing the ship to depart from the port on her voyage without payment.

[Cited in Cole v. The Atlantic, Case No. 2,976; The Chusan, Id. 2,717; Packard v. The Louisa, Id. 10,652; Leland v. The Medora, Id. 8,237; Macy v. De Wolf, Id. 8,933; Burke v. The M. P. Rich, Id. 2,161; The James Guy, Id. 7,195; Griswold v. The Nevada, Id. 5,839; The Napoleon, Id. 10,011.]

3. The fact that the master and owners are personally liable for the supplies does not destroy the lien; for the party may trust to the credit of the ship, the master, and the owner.

[Cited in Phelps v. The Camilla, Case No. 11,073; The Chusan, Id. 2,717; Packard v. The Louisa, Id. 10,652; Leland v. The Medora, Id. 8,237; Hill v. The Golden Gate, Id. 6,492; Thomas v. Osborn, 19 How. (60 U. S.) 28; Harris v. The Kensington, Case No. 6,122; McAllister v. The Sam Kirkman, Id. 8,658; Cole v. The Atlantic, Id. 2,976; The Washington Irving, Id. 17,244; Hazlehurst v. The Lulu, 10 Wall. (77 U. S.) 202; The Sarah J. Weed, Case No. 12,350; Harney v. The Sydney L. Wright, Id. 6,082a; The Graf Klot Trautvetter, 8 Fed. 837; The City of Salem, Id. 837; The Ellen Holgate, 30 Fed. 127; The Scotia, 35 Fed. 909; The D. B. Steelman, 48 Fed. 581; The Stroma, 53 Fed. 283, 3 C. C. A. 530.]

[Cited in Harned v. Churchman, 4 La. Ann. 310; Young v. The Orpheus, 119 Mass. 184.]

See The Chusan [Case No. 2,717], where this case is affirmed.

[4. Cited in the Johns Walls, Jr., Case No. 7,432, to the point that where a credit is given no libel can be maintained until the expiration of the term of credit.]

[5. Cited in The Medora, Case No. 9,391, to the point that the master is a competent witness to prove the necessity for the supplies furnished.]

[6. Followed in The Chusan, Case No. 2,716, and cited in The Ann C. Pratt. Id. 409, to the point that the lien created by the maritime law

[1] [Reported by Charles Sumner, Esq.]

may be and is waived by the creditor by any act which is inconsistent with an intention to receive or retain that lien, such as the taking of a negotiable note given by the owner of the ship on time.]

[7. Cited in Todd v. The Euphrates, Case No. 14,074, and Bailey v. Sundberg, 43 Fed. 84, to the point that, in availing themselves of liens, creditors must exercise due diligence as to the proper time and circumstances.]

This was the case of a libel in rem brought by a material man for certain supplies, and especially for a cable furnished to the brig Nestor [Thomas Merrill, claimant]. The articles, amounting to the value of $168.46, were furnished at Alexandria in the District of Columbia, by the libellant, Lincoln Chamberlain, a resident merchant there, at the request of the master of the brig, then lying in that port, but belonging to the port of Portland in the state of Maine, and bound on a voyage from thence to other ports. In the district court there was a decree in favor of the libellant, charging the vessel with the value of the cable, and rejecting the claim for the other supplies. From that decree the respondent appealed to this court; and the question here was of course narrowed down to the point, whether the cable was necessary; and, if so, whether under all the circumstances the proceeding in rem could be maintained. At the argument, the necessity of the cable seemed not susceptible of doubt; and the controversy turned almost entirely on the other point.

William Pitt Fessenden, for libellant.
Mr. Daveis, for claimant.

STORY, Circuit Justice. In respect to the right, in point of jurisdiction, of maintaining this suit in rem in favor of material-men, it does not appear to me that there is any well-founded objection. The admiralty has, as I conceive, a clear jurisdiction to maintain such suits, whenever the supplies have been furnished to the vessel in a foreign port; and every port is foreign to her, which is not in the same state to which she belongs. So the doctrine was laid down in the case of The General Smith, 4 Wheat. [17 U. S.] 438, and it has never, to my knowledge, been in the slightest degree departed from. See also, the case of The St. Jago de Cuba, 11 Wheat. [24 U. S.] 409, 415–417. Abb. Shipp. pt. 2, c. 3, § 15, note 1 (Am. Ed. pp. 115, 116.) See also, 1 Bell, Comm. 525–527; 2 Bell, Comm. 39. Upon principle it appears to me equally clear. If ever an occasion should require it, I should not shrink from the duty of vindicating this doctrine in its full extent. But until the supreme court has justified me in sustaining a doubt. I shall content myself in following the doctrine, which it has deliberately avowed, as a duty most appropriate for one, who is called upon to administer the law under its guidance.

The only real question in this cause, is whether there are any circumstances, which show, that the general right to provide in rem has been displaced or waived. It is, in the first place, said, that here a personal credit was given to the master, excluding any credit to the owner or to the ship. Now I agree, that if the libellant has given an exclusive personal credit to the master, he cannot afterwards, upon any change of circumstances or opinion, resort to the ship, or shift the responsibility over upon the owner. But prima facie the supplies of material-men to a foreign ship, that is, to a ship belonging, or represented to belong, to owners resident in another state or country, are to be deemed to be furnished on the credit of the ship and the owners, until the contrary is proved. This appears to me the result of the authorities, many of which are referred to in Lord Tenterden's treatise on Shipping, and in the notes of the American editor. Abb. Shipp. pt. 1, c. 1, § 11; pp. 18, 19, note 1; Id. pt. 1, c. 3, § 8, note 1, p. 76; Id. pt. 2, c. 22, §§ 1, 2, note 1, p. 100; Id. pt. 2, c. 3, § 15, note 1, p. 116; Id. § 16, and note. There is certainly a total absence of all proof, that any exclusive credit was given, or intended to be given, to the master. It is not sufficient to show, that the master himself may be personally liable; for he is in all cases so liable for supplies and necessaries furnished for the ship, unless the credit be exclusively confined to the owners. The owners may be liable, notwithstanding the master is also liable for such supplies and necessaries. Abb. Shipp. pt. 2, c. 3, §§ 1–4; Id. pt. 1, c. 3, § 8, note; Id. § 15, note.

But the case does not rest upon the mere want of any evidence to establish an exclusive credit given to the master; for, if the master's testimony is competent, there is the most positive proof to the contrary. He swears in direct terms, that he purchased the cable "on a credit of ninety days on account of the brig Nestor and owners." An objection, however, is taken to his competency; and it is argued, that he cannot be a witness, where the verdict would establish any thing in his favor or against him; or where it might be simply given in evidence to establish any thing for him or against him. Considered merely in the light of master, it is difficult to perceive any solid ground against his competency. He is but an agent; and the case resolves itself into the common case of an agent offered to prove the acts done under his agency. An objection of that sort has been so many times overruled, that it is not now open to controversy.

But it is said, that he was also charterer of the brig for the voyage, under a written agreement in the case. Let us see, then, what is the nature of that agreement. It purports to be between the owners and the master, whereby they let the brig Nestor to him, "for a voyage from Portland to Eastport and St. Andrews, on the British lines, for a cargo of plaster, and from thence to one or more ports in the United States, and

from thence to any permitted port or ports on the globe, if he can obtain a fair, good freight, and back to the United States and to Portland; the owners to pay all necessary repairs on said brig, for sails and rigging." And the master agreed "to pay to the owners one half of all the gross freights and passage-money made during the voyage and voyages aforesaid;" and further, "to pay from his half of his earnings all wages, provisions, port-charges, &c., during the said voyage; and to deliver the said brig Nestor up to them or their order when called for, together with all her appendages received, wear and tear excepted." This is the substance of the agreement, there being only one other clause, providing for the reduction of tonnage, and custom-house fees, and pilotage, from the gross freight and primage, if the brig should obtain a freight from the southward to a foreign port. Now, it is argued, that this agreement constituted the master owner of the brig for the voyage, and made him primarily and exclusively liable as owner for the cable. But assuming the effect of this agreement to be to constitute the master owner for the voyage for some purposes, (on which, however, no opinion is intended to be given), yet it is plain, from the terms of the instrument, that the repairs for sails and rigging were to be at the expense of the owners. A cable is plainly a part of the rigging of a vessel; and so the parties understood the language of the agreement; for when, in a prior part of the voyage at Eastport, a cable and anchor were lost, the latter (an anchor) was supplied by the owners, and the brig worked her way to Alexandria with a poor hemp cable then on board. Indeed, the owners do not now set up any defence against their original liability to pay some person for the cable; but insist, that it has been already allowed for in their settlement with the master.

If, then, the owners were by their agreement bound to pay for the repairs and rigging, in what manner is their general liability affected by that agreement? There is no pretence to say, that the contents of the agreement were ever communicated to the libellant; and if they had been, it would be difficult to conjecture, how that circumstance would prove, that the libellant waived all remedy against them, and trusted exclusively to the credit of the master. They admit their liability for repairs, on that instrument; and therefore the master acted as their agent in procuring them. It might have been very different, if the master had been under a known engagement to make all repairs during the voyage. Take the case either way, then, it furnishes no ground for a presumption, which can exonerate the owners. If the agreement was not communicated, the libellant must be presumed to have trusted to the general credit of the owners, in the absence of all counteracting circumstances. If it was communicated, then the implied obligation to provide for repairs in the given case, notwithstanding the letting of the brig for the voyage, is explicitly retained by the owners. The master, then, is not, as charterer for the voyage, an incompetent witness; for, in regard to the purchase of the cable, he acted merely as agent for the owners. He was not liable therefore in his character as charterer; but, if at all, only in his character as master. The posture of the case is not, then, in the slightest degree varied by the introduction of the agreement.

But I wish to guard against any inference, that, if the master had been charterer and owner for the voyage for all purposes, he would not have been entitled to hypothecate the ship for any necessary supplies or repairs. I know of no principle, which disables a master by being charterer from exercising the common right of hypothecation, either express or implied, under the maritime law. The owners by trusting him, or any other charterers, with the management and navigation of the ship during the voyage, trust him and them with the usual powers in cases of necessary repairs and supplies. A material-man, who furnishes supplies in a foreign port, or to a foreign ship, relies on the ship itself as his security. He may, if he pleases, insist upon a bottomry bond with maritime interest, as the security for his advances; in which case, he gives credit exclusively to the ship, and must take upon himself the risk of a successful accomplishment of the voyage. But if he is content with receiving the amount of his advances and common interest, he may rely on that tacit lien or claim, which the maritime law gives him upon the ship itself, in addition to the personal security of the owners. Wherever a lien or claim is given upon the thing by the maritime law, the admiralty will enforce it by a proceeding in rem; and, indeed, it is the only court competent to enforce it.

The general maritime law, giving this lien or claim upon the ship for supplies, makes no distinction between the cases of domestic and of foreign ships, or between supplies in the home port and abroad. 2 Bell, Comm. 525–527. The rule was doubtless drawn originally from that common fountain of jurisprudence, the civil law, to which the common law, as well as the law of continental Europe, is so largely indebted. The civil law declared, "Qui in navem extruendam vel instruendam credidit, vel etiam emendam, privilegium habet," (Dig. lib. 42, 5, 26); and again, "Quod quis navis fabricandae, vel emendae, vel armandae, vel instruendae causa, vel quoquo modo crediderit, vel ob navem vendi tam petat, habet privilegium post fiscum," (Dig. lib. 42, 5, 34.) Pothier, Pand. lib. 42, tit. 5, § 33; Id. lib. 20, tit. 4, per tot. This doctrine was easily transferred into the early codes of maritime nations, from its general convenience, and the sound policy of multiplying the resources of credit of the masters and owners of ships in cases of necessity;

and we find it accordingly soon recognised as a principle pervading the maritime law, and giving confidence to the intercourse of different nations by navigation. See Roccus de Nav. et Naul. notes 91–93; Domat, Civ. Law, bk. 3, tit. 1, § 5; Consolato del Mare, c. 32; Emérig. Mar. Loans, c. 12, §§ 1–4; 2 Brown, Civ. & Adm. Law, 142; 1 Valin, Comm. lib. 1, tit. 14. art. 16; ᐧAbb. Shipp, pt. 2, c. 3, § 10; 2 Bell, Comm. 525–527. For a long period the same doctrine was fully recognised and acted upon by the admiralty courts of England without interruption. And though it can no longer be deemed in force, in regard to materials supplied to domestic ships in their domestic ports: yet, as a part of the maritime law, it is still applied to foreign ships in our ports. And the lien acquired in other states under that law, for supplies to our own ships while abroad, are recognised and enforced in our admiralty courts, upon the general principles of that comity, which pervades the maritime courts of all countries. But it is said, that, here, a credit of ninety days was allowed upon the purchase of the cable, and that such a credit is wholly inconsistent with the existence of any lien on the ship. This objection is founded upon a notion, that the liens given by the maritime law are governed exactly by the same principles, which regulate common-law liens. It is certainly true, that by the common law a lien imports, that the party, who claims it, is in possession of the thing, and his lien is neither more nor less than a right to detain it, until his claim is satisfied. So that, where there is no possession, actual or constructive, there can be no lien. Lord Tenterden (Abb. Shipp. pt. 3, c. 1, § 7; Id. pt. 2, c. 3, §§ 10, 15, 16) lays down this doctrine in very broad terms, and in a general sense it is well founded. For instance, if a shipwright has repaired a ship, while it is in his possession he has a lien on it for the amount of the repairs; but, if he once parts with the possession, his lien is gone. And if he never has had possession of the ship, he never has acquired any lien whatever. So, if the nature of his contract excludes the implication, that the parties intended any lien, the same result follows; for it is competent for parties to waive a benefit of this sort. If, therefore, he undertakes to repair a ship, and receives possession, and he is to give credit for the amount of the repairs for a certain period; the giving of such credit is sufficient to repel the presumption of a right of lien; for it cannot be supposed, that the parties intended, that the shipwright should retain the possession of the ship, and prevent her employment by the owner during the whole time of the credit. The giving of credit under such circumstances is inconsistent with the lien, because it supposes, that the credit is for the benefit of the owner; which it cannot be, if he is to be excluded from the possession and use of his ship. The law, therefore, in such cases interprets the contract between the parties upon rational principles; and deems the lien waived by consent. Abb. Shipp. pt. 2, c. 3, § 15, and note.

It is obvious upon the slighest consideration, that this qualification of the doctrine of lien, founded on and accompanying the possession of the thing, cannot be applicable to claims, which neither presuppose, nor originate in possession. Indeed, such claims are not, in a strict sense, liens, though that term is commonly used in our law to express, by way of analogy, the nature of such claims. Language is in this way perpetually deflected from its original meaning, and applied to things, which have a strong similitude, but not a perfect identity. Some obscurity too is thrown over the subject by the use of language borrowed from the civil and foreign law, and applied in a sense not exactly correspondent with the sense, in which it is found in that law. In the civil law the term pignus (pawn) was in an accurate sense applied to cases, where there was a pledge of the thing, and possession was actually delivered to the person, for whose benefit the pledge was made; and hypotheca (hypothecation), where the possession of it was retained by the owner. And pignus was especially used in such cases, where the thing was a moveable. The Institutes of Justinian notice this distinction. "Nam pignoris appellatione eam proprie rem cóntineri dicimus, quae simul etiam traditur creditori, maxime si mobilis sit. At eam, quae sine traditione, nudâ conventione tenetur, proprie hypothecae appellatione contineri dicimus." Inst. lib. 4, tit. 6, § 7; Dig. lib. 13, tit 7, l. 35; Halifax, Anal. Civ. Law, 63; Vinnius ad Inst. lib. 4, tit. 6, § 7, p. 800, etc. And this distinction, though not always strictly adhered to in the language of the commentators, was a leading use. But in each case, the same remedies belonged to the pawnee, whether it was a pignus or hypotheca, for in each case he had a right to the hypothecary action. "Inter pignus autem et hypothecam, quantum ad actionem attinct, nihil interest." Inst. lib. 4, tit. 6, § 7; Dig. lib. 20, tit. 1, l. 5, 1. See, also, 1 Bell, Comm. 25, 26. By the civil law, there might also be a pignus and hypotheca as well of moveables, as of immoveables; that is, there might be an hypothecation or pledge of personal property without possession or delivery of the thing; and this right travelled with the thing into whosever possession it might come. A pledge then in the Roman law answered exactly to a pledge of moveables in our law, where possession is indispensable. An hypothecation answered to a mortgage of real estate in our law, where the title to the thing may be acquired without possession. In the French law, however, from the inconvenience growing out of the transfers of personal property, subject to such prior titles by hypothecation, the doctrine has been constantly held, that moveables cannot be hypothecated, that is, transferred by way of pledge without possession; but that

hypothecation is confined to immoveables. Hence the maxim, that moveables have no sequel by a mortgage. Domat. bk. 3, tit. 1, § 1; 1 Valin, Comm. lib. 1, tit. 14, art. 1. When, therefore, we find the term hypothecation used in the French law, we are generally to understand it as used in this restrictive sense, though it is sometimes used in a broader and looser sense, as we sometimes call a mortgage a pledge, and a pledge a mortgage. Emérigon, in the passages cited at the bar, is to be understood as using hypothecation in its strict sense, unless where he qualifies it by some accompanying explanation. Emérig. Contrats à la Grosse, c. 12, § 1–5; 1 Bell, Comm. 25, 26, 39.

Now a lien by the martime law is not strictly a Roman hypothecation, though it resembles it, and is often called a tacit hypothecation. 1 Domat. bk. 3, tit. 1, § 5. It also somewhat resembles what is called a privilege in that law, that is, a right of priority of satisfaction out of the proceeds of the thing in a concurrence of creditors. 2 Browne, Civ. & Adm. Law, 142; Dig. lib. 42, tit. 5; Abb. Shipp. pt. 2. c. 3, § 10. Emérigon says, that this privilege was strictly personal, and gave only a preference against simple contract creditors, and had no effect against those, who were secured by express hypothecations; and that this personal privilege given by the Roman law is unknown in the French jurisprudence; for by the law of France every privilege carries with it a tacit and privileged hypothecation, at least as to the thing which is the subject of it. Emérig. Contrats à la Grosse, c. 12, §§ 1, 2. See, also, 2 Browne, Civ. & Adm. Law, 142. See, also, Merlin, Répertoire, Privilége de Créance, § 1. Lord Tenterden has remarked, that a contract of hypothecation made by the master does not transfer the property of the ship; but only gives the creditor a privilege or claim upon it, to be carried into effect by legal process. Abb. Shipp. pt. 2, c. 3, § 23. See, also, 1 Bell, Comm. 39, 94. And this is equally true, whether the hypothecation be express or tacit.

A maritime lien does not include, or require, any possession of the thing. It exists altogether independently of such possession. Nobody has supposed, that the lien on bottomry bonds, as for seamen's wages, is connected with any actual or constructive possession by the parties, seeking to enforce it in rem. This distinction between maritime liens, and strict possessory liens at the common law, goes very far to dispose of the objection now under consideration. There is no inconsistency in giving credit for supplies, and at the same time retaining the lien on the ship for the value of those supplies. In fact, it would be utterly inconsistent with the professed object of all such supplies, to retain the possession. That object is, to procure necessary repairs and supplies for the purpose of completing the voyage. But how is the voyage to be completed, if the material-man is to hold possession of the vessel, in order to secure his lien for the necessary repairs and supplies? The truth is, that the maritime law presupposes a credit given, a delay of payment, an intentional postponement of the right to enforce the claim in rem, at the same time that it creates the lien. How absurd would it be to declare, that the material-man should have a lien on the ship for his supplies, whenever, in case of necessity, the master, not having funds, is compellable, in order to proceed on his voyage, to obtain such supplies; and yet at the same time to declare, that if the ship left the port without payment of his demand, the lien should be extinguished; when the very case supposed is, that the master has no immediate means of payment. How is he to pay without funds? And if he has funds, what use is there in the enhanced expense of a credit? If he has funds, he will pay at once, and have the work done, or supplies furnished at cash prices. It is only when his funds fail, that he will ask a credit for the owners upon the security of the ship. The effect of denying the lien in such cases would be, to compel the master to break up the voyage, or to resort to the extraordinary expedient of a bottomry bond upon onerous interest, to the serious injury of the owner. The maritime law, in cases of material-men, as in other cases, where it gives a tacit hypothecation or lien, proceeds upon a different principle. It gives the lien upon the ship as an auxiliary to the personal security of the owner. It does not require the lien to be enforced before the voyage is completed. It allows the party to give credit, because it is for the general benefit of navigation and trade. It is not necessary to say, that the lien is indelible; or that it may not be lost by gross neglect and delay to enforce it, at least where the rights of other persons have intervened. But, as in cases of seamen's wages and bottomry bonds, it requires only reasonable diligence in enforcing the claim at a proper time, and under proper circumstances. The admiralty will not in cases of this sort sit for the purpose of enforcing stale claims, any more than in other cases, where its jurisdiction is sought. But, where the claim is recent, and the proceedings are had within a reasonable time, and in good faith; where there has been a clear case of necessity, and a credit given to the ship, the maritime law will not suffer the lien to be defeated by the mere departure of the ship from the port with or without the consent of the material-man. His giving credit to the ship for the voyage, or for a definite period, is not inconsistent with a positive intention to hold the ship bound for the payment by a tacit hypothecation or lien. It is not an election to rely exclusively upon the personal credit of the master or owner. His right, not growing out of possession, is not affected by the removal of the ship from the place, where possession may be enforced, or may be suspended.

A suggestion has been thrown out, that

there is a difference between giving credit indefinitely, and for a time certain; for that in the latter case the remedy in rem is necessarily suspended during the fixed period of the credit. So is the remedy in personam during the same period. But this circumstance does not defeat the security in rem, any more than in personam, as soon as the credit has expired. There is no difficulty in supposing the existence of a lien for a debt solvendum in futuro. If a bottomry bond were payable in thirty days after the safe arrival of the vessel, the additional period of credit would not defeat the hypothecation. If seamen's wages were by the contract not payable until ten days after the voyage was completed, it would not disturb the lien on the ship for those wages. The lien has in all such cases an inchoate existence from the moment of the contract, and attaches sub modo on the ship. The lien for seamen's wages attaches ordinarily on the ship during the voyage, although no wages are strictly due until the end of the voyage. A sale of the ship, pending the voyage, would not defeat this inchoate lien; and when the voyage was completed, the lien would have relation back to the commencement of the voyage.

There are analogous cases of liens even at the common law, where there is no possession, and where credit is given for a fixed period. Such is the lien of a vendor of real estate for the purchase money. Possession is not necessary to maintain that lien; neither does a long fixed credit annihilate, or suspend it. Yet the argument would apply at least as forcibly in such a case, as it does to the case now in judgment. The case of Ramsay v. Allegre 12 Wheat. [25 U. S.] 611, does not in the slightest degree impugn the foregoing reasoning. That case (in the judgment of which I concurred) was founded upon a very different principle. There, the material-man had received a negotiable promissory note, payable at four months, for the amount of his debt, as conditional payment. The note had not been paid; but it was still outstanding, and had never been surrendered; and it did not appear, that it had not in fact been negotiated. Under such circumstances the supreme court held, that a libel by the material-man could not be maintained. Now, there are two considerations proper to be noticed with reference to this case. The first is, that the taking of such a note is primâ facie a presumptive extinguishment sub modo of the debt; and if it had been actually negotiated, whether paid or not, the creditor could have had no right to recover his debt, as the debtor would still be responsible to the holder of the note; and he ought not to be twice liable for the same debt. The second is, that the receiving of such a note is direct proof, that credit is given to the personal responsibility of the owner, and presumptive proof, that no credit is given to the ship; or, in other words, that there is a

waiver of any lien on the ship. It cannot be ordinarily presumed, that a ship-owner, giving a negotiable note for supplies, intends at the same time, that a lien shall exist on the ship itself for the debt; for then the lien might be in the hands of one person, and the negotiable security in the hands of another. To bring the present case within the reach of that decision, it should be shown, that a promissory negotiable note of the master or owner had been taken by the libellant. I have the most confident reasons to know, that the decision of the court in Ramsay v. Allegre was not intended to shake any part of the doctrine in the case of The General Smith [supra]. There is a case decided by Lord Stowell, upon a principle analogous to that in Ramsay v. Allegre. A seaman elected to take a bill of exchange on the ship-owners for the amount of his wages; and the bill being afterwards dishonored, and the owners having become bankrupts, he sought a remedy in rem against the ship, for his wages. But Lord Stowell dismissed the libel. The William Money, 2 Hagg. 136.

Without going more at large into the argument, my judgment is, that the libel is well founded in point of jurisdiction; and that there has been no waiver of the lien implied by the maritime law for these supplies. Indeed, the moment the testimony of the master is admitted, it is impossible to raise any presumption of a waiver from any of the circumstances; for he positively swears to facts, which establish, that credit was given to the ship, thus displacing, by an express understanding, all mere argumentative inferences. The decree of the district court is, therefore, affirmed, with costs. .