**CHANTIER NAVAL VOISIN and Bernard Voisin Sarl Les Sports Nautiques De Cannes, Plaintiffs,**

v.

**M/Y DAYBREAK, her engines, tackle, appurtenances, etc., in rem, Defendant.**

**No. 84–2909–CIV–MARCUS.**

United States District Court, S.D. Florida.

Jan. 27, 1988.

John Campbell, Holland and Knight, Miami, Fla., for plaintiffs.

Charles C. Kline, Mershon, Sawyer, Johnston, Dunwody & Cole, Miami, Fla., for defendant.

Richard J. McAlpin, Mitchell, Harris, Horr & Assoc., P.A., Miami, Fla., for intervenors.

## ORDER

MARCUS, District Judge.

THIS ACTION was brought by Plaintiffs Chantier Naval Voisin and Bernard Voisin Sarl Les Sports Nautiques De Cannes seeking to recover under a maritime lien for services rendered and materials supplied to the vessel M/Y DAYBREAK. Intervenor, Florida Yacht Basin, seeks to recover for

services provided as the court appointed substitute custodian of the defendant vessel. The Complaint was tried before the Court without a jury, and pursuant to Rule 52(a), Federal Rules of Civil Procedure, we make the following Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

1. Plaintiffs, during the relevant period, operated a marine repair and supply business in Cannes, France. Chantier Naval Voisin ("Chantier Naval") is a yacht repair facility. Bernard Voisin Sarl Les Sports Nautiques De Cannes ("Bernard Voisin") is a related ship chandler.

2. The Defendant vessel is the M/Y DAYBREAK (the "vessel" or "DAYBREAK"), official number 671254.

3. The Claimant, Silhouette Charters, Inc. was the owner of the DAYBREAK at the time the vessel was arrested and has appeared in this action on behalf of the DAYBREAK.

4. Intervenor, Marine Supply Company, Inc., a Florida corporation, asserted a claim for a maritime lien for necessaries rendered to the Defendant vessel. This Court entered judgment on its claim September 5, 1986.

5. Intervenor, Florida Yacht Basin, a Florida corporation, has asserted a claim based upon services rendered to the vessel in its capacity as substitute custodian.

6. During the period beginning November 1982 until a date on or about April 1983, the Plaintiffs performed certain work upon and supplied certain materials to a vessel known as the Naque I.

a. "Abstract of Accepted Items in Estimate" [Plaintiffs' Exhibit 20A] details the work performed by Chantier Naval on the vessel. This document lists 64 separate items and the total cost was 2,197,249 French francs.

b. None of the work performed on the vessel was essential for her navigation. [Voisin Dep. at 31].

c. Some of the work performed was important to maintain the vessel [*Id.* at 32], including, *inter alia,* painting, work on the fuel tanks, generators, engine room blowers, valves and the main engines.

d. Most of the work was performed for the "pleasure of the user." [*Id.* at 31].

7. Supplies were furnished by Plaintiff Bernard Voisin to the Naque I. The cost of those supplies were 217,573 French francs. [Plaintiff's Exhibits 22a–24a]. These supplies were not essential to the vessel's navigation. [*Id.* at 33].

8. Eighty percent of the costs for the work performed on the vessel by Chantier Naval were paid by the owner of the Naque I. The vessel left the port in or about April 1983 although the balance of the bills remained unpaid.

9. The entire balance of the amount due Bernard Voisin for supplies was never paid.

10. After leaving the shipyard, the vessel traveled to Monaco and St. Tropez during the period between April 1983 and the middle of September 1983.

11. On June 10, 1983, the owner of the Naque I agreed to the following payment schedule:

| Due Date | Amount |
|---|---|
| June 10, 1983 | $20,000 (U.S.) |
| July 11, 1983 | $20,000 (U.S.) |
| July 26, 1983 | $20,000 (U.S.) |
| September 16, 1983 | $40,000 (U.S.) |

The June 10 payment was received by Chantier Naval on August 31, 1983. The other payments were never made.

12. In mid-September, the vessel traveled to Palima de Mallorca and Ibez, Spain. On or about October 26, 1983, Plaintiffs obtained an order to seize or arrest the vessel in Ibez. However, the seizure did not occur because the vessel departed Ibez before the seizure could be effected.

13. The vessel traveled form Spain to the United States. Voisin was informed in late 1983 that the vessel was in the United States, however, he was unable to locate it. On or about October 1984, Voisin located the vessel in Ft. Lauderdale, Florida.

14. Plaintiffs caused the Defendant vessel to be arrested on December 12, 1984, in Ft. Lauderdale, claiming that it was the former Naque I and that they held maritime liens for labor and materials furnished to the Naque I.

15. Between the time the work was performed on the Naque I and June 11, 1984, the name of that vessel was changed to the M/Y ARIZ. Subsequently, the name of the vessel was again changed to the M/Y Daybreak.

16. We find that the M/Y DAYBREAK is the same vessel upon which the work in question was performed and the materials supplied by the Plaintiffs.

17. On June 11, 1984, vessel, official number 671254, known as the M/Y DAYBREAK ex ARIZ ex Naque I was sold by Ali Reza Shipping S.A. to Silhouette Charters, Inc. [Plaintiffs' Trial Exhibit 49].

18. The work done by Chantier Naval was covered by proposals (estimates) approved by the captain or user of the Naque I. Included in the proposals were general conditions. One of the conditions contained the following language:

> In case of difficulties or dispute, not amicably settled, Tribunal de Commerce de Nice will be the only competent court to judge them.

19. The DAYBREAK was under Court ordered *in rem* arrest from December 15, 1984 up to and including March 25, 1985. Intervenor was the Court Appointed Substitute Custodian of the DAYBREAK during this period.

20. Florida Yacht Basin as Court appointed custodian provided these services, and incurred the following costs:

| Service | Rate | Period | Total |
|---|---|---|---|
| Dockage | $39/day | 12/15/84–1/31/85 48 days | $1,872.00 |
| Storage | $54/day | 2/1/85–3/25/85 53 days | 2,862.00 |
| Guard Service | $150/day | 12/17/84–3/25/85 99 days | 14,850.00 |
| Miscellaneous Goods and Services | | | 6,479.91 |

21. The foregoing charges represent fair and reasonable charges incurred by the substitute custodian for the preservation of the DAYBREAK.

22. The DAYBREAK contained valuable antiquities and other removable items which could easily be sold if removed without authorization.

## II. CONCLUSIONS OF LAW

1. The underlying controversy in this case stems from a demand for payment for services and supplies rendered by French companies. The work was performed in France, and the contracts executed there. At the time the work was performed the vessel was registered in Panama. Subsequently, the vessel was arrested in the United States in order to enforce a purported lien. Plaintiffs suggest that under the facts of this case, United States law must be applied. The Defendant maintains that the law of France is applicable.

The first step in resolving this choice of law question is to determine whether, in fact, the laws of France and the United States are in conflict. Under 46 U.S.C. § 971, "[a]ny person furnishing repairs, supplies ... or other necessaries, to any vessel whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem...." Given the facts of this case, as described *supra*, there can be little doubt that had they occurred within the jurisdiction of the United States, a maritime lien in favor of the Plaintiffs would have arisen.

■ 2. The source of a maritime lien under French law is not as obvious. The parties submit that a maritime lien may "arise" under the circumstances of this case from three sources: First, the French Law of January 4, 1967; second, the International Convention Relating to the Arrest of Seagoing Ships, Brussels, May 10, 1952, 439 U.N.T.S. 193, *reprinted in* 6A *Benedicts on Admiralty* Doc. 8–1 (7th ed. 1987) [hereinafter the "Brussels Convention 1952"]; and, third, the International Con-

vention Regarding Unification of Certain Rules Relating to Maritime Laws and Mortgages, Brussels, April 10, 1926, 120 L.N.T.S. 187, *reprinted in* 6A *Benedicts on Admiralty* Doc. 8–2 (7th ed. 1987) [hereinafter the "Brussels Convention 1926"]. Defendant contends that this Court may not find, based on the substance of Plaintiffs' expert witness testimony concerning French law, that a maritime lien could have arisen under these laws. The expert, Michael Touffait, asserted that a lien arises under the Brussels Convention 1952 and not under the other two sources of law. Defendants contend that the Brussels Convention 1952 merely embodies the procedural rules regarding the arrest of a vessel and provides no substantive basis for the creation of a lien. Further, Defendant maintains that Plaintiffs should be bound by the declaration of its expert witness and that therefore they have not identified any basis for the existence of a maritime lien in their favor.

3. Under Fed.R.Civ.P. 44.1, it is clear that while the court may accept evidence submitted by the parties as to the proof of foreign law, it is not bound by the evidence submitted and may make its own investigation and consider "any relevant material or source," *id.*, concerning the foreign law. Accordingly, we are not bound by the substance of the Plaintiffs' expert witness.

4. We note that both the Brussels Convention 1926, as well as the French Law of January 4, 1967 contains this language:

The following give rise to maritime liens on a vessel, ...:

(5) Claims resulting from contracts entered into or acts done by the master, acting within the scope of his authority away from the vessel's home port, where such contracts or acts are necessary for the preservation of the vessel or the continuation of its voyage, whether the vessel master is or is not at the same time owner of the vessel, and whether the claim is his own or that of shipchandlers', repairers, lenders, or other contractual creditors.

Brussels Convention 1926, Art. 2 § 5. The substantive distinctions between these sources of law and the provisions under the United States Code rest primarily with the definition of the terms "necessaries" and "necessary for the preservation of the vessel." "[T]he jurisprudence interpreting [46 U.S.C. § 971] requires that the phrase 'other necessaries' be given a broad meaning.... [The phrase] refers ... to supplies and services that are 'reasonably needed in [a] ship's business.'" *Equilease Corp. v. M/V Samson,* 568 F.Supp. 1259, 1263 (E.D.La.1983) (citations omitted), *rev'd on other grounds,* 756 F.2d 357 (5th Cir. 1985), *cert. denied,* —— U.S. ——, 107 S.Ct. 570, 93 L.Ed.2d 575 (1986). The broad interpretation of this provision appears to contrast significantly with the French provisions which specifically limits the term "necessary" to those contracts "necessary for the preservation of the vessel, or the continuation of its voyage." The plain language of these provisions indicates that the term "necessary" is to be given a more restrictive interpretation than the similar United States Code provision. We are convinced that the relief afforded under these provisions would be substantially different. Therefore, a conflict of laws does exist and we must resolve which law is applicable in this case.

5. The Supreme Court has stated: Maritime law, like our municipal law, has attempted to avoid or resolve conflicts between competing laws by ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved. The criteria, in general, appear to be arrived at from weighing of the significance of one or more connecting factors between the shipping transaction regulated and the national interest served by the assertion of authority.

*Lauritzen v. Larsen,* 345 U.S. 571, 582, 73 S.Ct. 921, 928, 97 L.Ed. 1254 (1953). In *Lauritzen,* the "seminal case on choice of law in admiralty," *Sigalas v. Lido Maritime, Inc.,* 776 F.2d 1512, 1516 (11th Cir.

1985), the Court identified seven factors that should be weighed in the determination of the applicable law:

1. place of the wrongful act;
2. law of the flag;
3. allegiance or domicile of the injured;
4. allegiance of the defendant ship-owner;
5. place of contract;
6. inaccessibility of foreign forum; and
7. the law of the forum.

*Lauritzen*, 345 U.S. at 583–92, 73 S.Ct. at 928–33. While these criteria were developed within the context of construing the applicability of the Jones Act, we note that this approach is not inextricably bound to the policies that are meant to be served by that particular statute. The Eleventh Circuit Court of Appeals has characterized Justice Jackson's opinion in *Lauritzen* as "a contacts-based choice of law analysis...." *Sigalas*, 776 F.2d at 1517. This manner of analysis is wholly consistent with accepted choice of law doctrine, and cannot be viewed as relating solely to Jones Act cases.

■ In reviewing these criteria, we note first that this list is not exhaustive, and that there can be no neat formulation with which to arrive at a precise result. *See Id.* However, given the facts of this case, we find that the application of French law is appropriate. It is clear that France may be correctly viewed as the place of the wrongful act, the place of allegiance of the injured party, as well as the place of the contract. We note further that there is evidence to suggest that the parties have access to a foreign forum. The contract between these parties contained a forum selection clause which identified the Tribunal de Commerce de Nice as the court competent to try disputes arising out of the contract. We make no determination as to the Defendant's amenability to suit there.

Moreover, other factors do not decisively point to United States law as appropriate. At the time the contract was created, the

vessel was of Panamanian registry. Neither party suggests that Panamanian law controls here. However, the *Lauritzen* court identified the law of the flag as "the most venerable and universal rule of maritime law relevant to our problem...." *Lauritzen*, 345 U.S. at 584, 73 S.Ct. at 929. While the consideration of this weighty criteria does not convince us by itself that the law of France or Panama should be applied, it certainly does not affirmatively factor in a decision to apply American substantive law.

6. The criteria which may point to the application of United States law requires an examination of what interest, if any, the United States has in the disposition of this matter. Questions regarding the law of the flag,[1] allegiance of the Defendant shipowner, and the law of the forum requires a determination of whether any public policy interest attaches by the fortuitous occurrence of the vessel docking and then being arrested in the United States.

■ The authority for the arrest of the DAYBREAK by a French citizen in the United States for work performed and materials supplied in France is based upon the Brussels Convention 1952. The application of this Convention underscores a fundamental distinction between the remedy as provided by United States law, and under the Convention. Historically, United States courts have adopted the personification theory of maritime jurisdiction. *See, e.g., The China*, 74 U.S. (7 Wall.) 53, 19 L.Ed. 67 (1868); *The Palmyra*, 25 U.S. (12 Wheat.) 1, 6 L.Ed. 531 (1827); *The Nestor*, 18 F.Cas. 9 (C.C.D.Me. 1831) (No. 10,126). "The scholars and jurists who support this theory assert that a ship is endowed with a juristic personality independent of the owner, and therefore is responsible for its torts." Collins, *Comments on the American Rule of In Rem Liability*, X Mar.Law. 71 (1985). Under this view, the debt for materials and supplies adheres to the vessel, and the vessel

---

**1.** The DAYBREAK was a U.S. flag vessel at the time of the arrest.

itself becomes "liable" for payment in satisfaction of the lien. The interests of the United States in enforcing the lien are ascertainable and apparent when the debt itself is residing within its jurisdiction.

"Under [the] procedural theory of in rem liability ... the arrest [of the vessel is] merely procedure, and that its only object [is] to obtain security that the judgment should be satisfied'" *Id.* (quoting 1 Selden Society, *Select Plans in the Court of Admiralty,* lxxii (R. Marsden ed. 1982)). One commentator has noted that "[o]bviously, [the Brussels Convention 1952] 'advances the procedural theory relating to actions in rem.'" *Id.* (quoting Thomas, *The Sister Ship Action In Rem,* 1979 Lloyd's Mar. Com. & L.Q. 158, 161). Therefore, we are faced with a conflict between the usually strong interests of the United States in enforcing maritime liens, and an enforcement procedure which is based on an opposite view of the law.

■ Article 9 of the Brussels Convention 1952 states:

> Nothing in this Convention shall be construed as creating a right of action, which apart from the provisions of this Convention, would not arise under the law applied by the Court which was seized of the case, nor as creating any maritime liens which do not exist under such law or under the Convention on maritime mortgages and liens, if the later is applicable.

Plaintiffs suggest that through the operation of this provision, even if this Court were to find that French law is applicable, this Court should apply United States law because this Court is "seized of the case." However we must find the application of renvoi inapplicable here. The explicit language of this article does not compel a court to apply its own law. It merely states that the convention itself does not create substantive rights distinct from the law that would be applied by a court of competent jurisdiction. We have found that because of the significant amount of contacts with that forum, the law of France should be applied in this case. This determination cannot be overridden by the strict adherence to the law of the forum and the operation of the Brussels Convention 1952 does not mandate this result. The lex fori analysis must give way to the substantial contacts calculus, particularly in light of the Supreme Court's ruling in *Lauritzen, supra.*

7. Having concluded that French substantive law must be applied to this case, we procede to the merits. Defendant contends that the French statute of limitations bars recovery in this action. It is maintained that under both the French Law of January 3, 1967 and the Brussels Convention 1926, the maritime lien for supplies expires six months from the date the supplies were furnished to the vessel, and the maritime lien for services expires one year after the date the services were rendered. Under these provisions, this action, filed in December of 1984 would not be timely.

■ The fact that we have concluded that French substantive law applies to this case does not divest this Court of its equitable powers, nor require that we apply French procedural law. *See Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 778 n. 10, 104 S.Ct. 1473, 1480 n. 10, 79 L.Ed.2d 790 (1984) (under traditonal choice of law principles, law of forum state governs on matter of procedure); *Foster v. United States,* 768 F.2d 1278, 1281 (11th Cir.1985) ("Pursuant to the conflicts doctrine of 'deprecage,' different substantive issues in a single case may have to be resolved under the laws of different states where the choice influencing decisions differ.") Further, actions brought in admiralty are not controlled by any statute of limitations, but by the doctrine of laches. *See, e.g., Azalea Fleet, Inc. v. Dreyfus Supply & Machinery Corp.,* 782 F.2d 1455, 1458 (8th Cir. 1986); *Pierre v. Hess Oil Virgin Islands Corp.,* 624 F.2d 445, 450 (3d Cir.1980). Accordingly, we must reject Defendant's contention this action is time barred based on the statute of limitations, even assuming

*arguendo* that the limitations period has been accurately detailed by the Defendant and that this issue may correctly be characterized as an issue of "substantive" law.

In determining whether the doctrine of laches acts to bar a claim, it has been noted that

> [c]ourts typically use an analogous state statute of limitations as a guide to the running of laches in admiralty cases. G. Gilmore & C. Black, *The Law of Admiralty* § 9–79, at 768–69 (2d ed. 1975). The equities of the parties on the facts of each case, however, must be considered as well. Where the delay is excusable and there has been no prejudice to the other party, mere passage of time poses no bar to relief. *Gardner v. Panama R. Co.*, 342 U.S. 29, 31, 72 S.Ct. 12, 13, 96 L.Ed. 31 (1951) (per curiam). Some courts balance the inexcusability of delay against prejudice. "A weak excuse might suffice if there has been no prejudice; an exceedingly good one might still do even when there has been some." *Larios v. Victory Carriers, Inc.*, 316 F.2d 63, 67 (2d Cir.1963); *see also Fidelity & Casualty Co. of New York v. C/B Mr. Kim*, 345 F.2d 45, 50 (5th Cir.1965).

*Jones v. Reagan*, 748 F.2d 1331, 1335 (9th Cir.1984), *cert. denied*, 472 U.S. 1029, 105 S.Ct. 3505, 87 L.Ed.2d 636 (1985). The French Statute of Limitations provides some guidance with regard to the resolution of this issue. However, there is no firm rule with which to determine whether there has been inexcusable delay, and it is left "to the sound discretion of the district court and ... depends on the careful balancing of several factors." *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1516 n. 12 (11th Cir.1984) (citations omitted).

The period relevant to this analysis appears to be between September 1983 and December 1984. The majority of the work performed and materials supplied to the Defendant vessel occurred between November 1982 and May 1983. One invoice is dated as late as June 28, 1983. The owners of the Naque I paid for 80% of the work performed by Chantier Naval Voisin before the vessel left the boat yard. Terms of the agreement to pay the outstanding balance were embodied in a telex dated June 10, 1983. One $20,000 payment was received on August 31, 1983. This action may be barred by the doctrine of laches only if we determine that the delay in commencing the suit was inexcusable and the delay was prejudicial to the Defendant.

In weighing the equities of this case, we find significant the fact that the Plaintiff attempted to create a mutually agreeable payment schedule by which the parties would avoid resolving this dispute in court. The failure of the Defendant to abide by that agreement militates against applying the doctrine of laches against the Plaintiff. Further, we note that when it became apparent that the Defendant was not going to pay the bill, Plaintiff attempted to arrest the vessel in Spain. That attempt was unsuccessful. It may be true that Plaintiff did delay in attempting to arrest the vessel once it was discovered that the vessel was in the United States, however, we cannot conclude that this factor, or the cumulative effect of the Plaintiffs' conduct prejudiced the Defendant. For the doctrine of laches to apply "the delay must subject [the defendant] to a disadvantage in asserting or establishing his claimed right or defense." *Avondale Shipyards, Inc. v. Vessel Thomas E. Cuffe*, 434 F.Supp. 920, 932 (E.D.La. 1977) (citations omitted). Here, Defendant has not pointed to any prejudicial effect occasioned by the initiation of the suit, except for the necessity of defending it. There has been no suggestion that the delay has prevented the Defendant from gathering evidence, or putting forth any available defense. Accordingly, we find that this action is not barred by the doctrine of laches.

■ 8. Defendant has also renewed its contention that the forum selection clause contained in the Voisin contracts deprives this Court of jurisdiction, or alternatively, that the clause represents a waiver of the lien or a specific contract term. In an

order dated February 5, 1987, we specifically rejected the contention that based on *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), the forum selection clause ousted this Court of jurisdiction. [Order, February 5, 1987 at 2]. Further, at that time we specifically refused to enforce that provision of the contract because the "Defendants did not attempt to enforce the forum selection clause until late 1986, and *after trial had already commenced in this action.*" *Id.* (emphasis in original). Therefore, the forum selection clause does not divest this Court of jurisdiction, and we decline to require the specific performance of this contract provision.

9. In applying French law to this matter, we are prepared to hold the Defendant liable only for those services which were necessary for the preservation of the vessel. According to the testimony of Bernard Voisin, the following were "important maintenance items." [Bernard Voisin Deposition at 32] performed on the Naque I by Chantier Naval.

| | | |
|---|---|---|
| 5 | Topsides Painting | 93.409,00 |
| 6 | Name Painting | 3.746,00 |
| 7 | Superstructures Painting | 130.758,00 |
| 8 | Maintenance Works on Tenders and Outboard Motors | 9.870,00 |
| 11 | Works on Fore and Engine Room Sump Tanks (Lloyd's Survey) | 29.258,00 |
| 12 | Fuel Tanks N° 4 and 5 Gauges | 6.890,00 |
| 13 | Sea Cocks (Lloyd's Survey) | 34.366,00 |
| 16 | Works on 30 KVA G & M Generators (Perking 4.108) | 27.719,00 |
| 18 | Engine Room Exhaust Blowers Overhauling | 6.604,00 |
| 20 | Various Works on Bilge Valves and Transfer Values | 14.678,00 |
| 31 | Works on Windlass | 16.945,00 |
| 46 | Works on Windlass (In addition to item 31 of this specification) | 9.912,00 |
| 48 | Works on 12V 149 GM Main Engines | 46.309,00 |
| 54 | Dry Docking 4 Days. Bottom Painting (Included FF.2.084. — VAT on Dry Docking) | 30.562,00 |
| 55 | Zinc Anodes Replacement | 7.898,00 |
| | TOTAL (French Francs) | 468.924,00 |

[Plaintiff's Exhibit 20a.]. Eighty percent of the amount due for the repair services has been paid. Evidence has not been submitted that would allow us to conclusively identify how those payments were applied. Accordingly, we hold that the Plaintiff is entitled to 20% of the remaining balance for those services deemed necessary for preservation of the vessel. Plaintiffs submitted no evidence which demonstrated that any of the supplies provided to the vessel by Bernard Voisin were necessary for the preservation of the vessel or continuation of the voyage. The failure of Plaintiffs to sustain their burden of proof as to this matter requires us to conclude that no damages may be recovered as to those items.

10. Judgments for money damages must be rendered in the currency of the forum. Therefore we must determine the appropriate rate of conversion from French francs to United States dollars. Of course, this rate is dependent on the prevailing rate on the date of the conversion. Historically, two Supreme Court cases have represented the differing approaches to the appropriate conversion rate. *Hicks v. Guinness*, 269 U.S. 71, 46 S.Ct. 46, 70 L.Ed. 168 (1925) used the "breach day rule," which identified the day of the breach as the operative conversion date. *Die Deutsche Bank Filiale Nurnberg v. Humphrey*, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926), utilized the "date of judgment rule," which identified the date of judgment as the operative conversion date. Recently, the First Circuit Court of Appeals comprehensively reviewed these cases and their progeny in *In re Good Hope Chemical Corp.*, 747 F.2d 806, 809–12 (1st Cir.1984), *cert. denied*, 471 U.S. 1102, 105 S.Ct. 2328, 85 L.Ed.2d 845 (1985). There, the court looked "to the jurisdiction in which the plaintiff's cause of action arose to determine which rule is applicable. The judgment day rule applies only when the obligation arises entirely under foreign law. If, however, at the time of breach the plaintiff has a cause of action arising in this country under Ameri-

can law, the breach day rule applies." *Id.* at 811. As discussed *supra*, Plaintiff's cause of action arose wholly under foreign law. Moreover, it is clear that on the date of the breach, the Plaintiff had no cause of action cognizable under United States law. At that time, the dispute was between a French citizen and a Panamanian vessel. There was no nexus, whatsoever, with the United States. Accordingly, the conversion rate of francs to dollars must be computed based on the conversion rate on the date of this judgment. *See also Gathercrest Ltd. v. First American Bank & Trust,* 649 F.Supp. 106, 120 (M.D.Fla.1985) (following *In re Good Hope Chemical Corp., supra.*), *aff'd* 805 F.2d 995 (11th Cir.1986).

██ 11. Florida Yacht Basin, as substitute custodian of the DAYBREAK, held a duty of care that was at least equal to the United States Marshal in caring for the vessel. *New River Yachting Center, Inc. v. M/V Little Eagle II,* 401 F.Supp. 132, 135 (S.D.Fla.1975). In assessing the priority of competing maritime liens, "the expense arising from the care and operation of the ship while it is in the custody of the Court through the U.S. Marshal," *United States v. One 254 Foot Freighter, M/V Andoria,* 570 F.Supp. 413, 415 (E.D.La.1983), *aff'd,* 768 F.2d 597 (5th Cir.1985), while not considered a lien, is nonetheless given top priority as an "expense of justice." *Id. See New York Dock Co. v. The Poznan,* 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955 (1927); *Donald D. Forsht Associates, Inc. v. Transamerica ICS, Inc.,* 821 F.2d 1556, 1560–61 (11th Cir.1987); *General Electric Credit & Leasing Corp. v. Drill Ship Mission Explorations,* 668 F.2d 811, 815–16 (5th Cir.1982) (citations omitted).

By Order dated December 12, 1984, Florida Yacht Basin was appointed the custodian of the DAYBREAK for possession and safekeeping. "It is well established that only those services or property furnished *upon the authority of the Court* for the common benefit of those interested in a fund *administered by the Court ...*" *One*

*254 Foot Freighter, M/V Andoria,* 570 F.Supp. at 416 (emphasis in the original) are compensable as an "expense of justice." Here, the intervenor by Court order provided these services which were reasonably necessary for the preservation of the vessel. Therefore, Florida Yacht Basin is entitled to recover the costs incurred in maintaining the M/Y DAYBREAK while it was under arrest.

██ 12. "Although an admiralty court has discretion to grant or deny prejudgment interest, the general rule in admiralty cases is that prejudgment interest should be awarded absent peculiar circumstances." *Chung, Yong Il v. Overseas Navigation Co., Ltd.,* 774 F.2d 1043, 1056 (11th Cir.1985) (citation omitted), *cert. denied,* 475 U.S. 1147, 106 S.Ct. 1802, 90 L.Ed.2d 346 (1986). The costs incurred in this case did not arise under any peculiar circumstances which would cause us to question the propriety of such an award which is meant to compensate the party for the use of its funds. Accordingly, both Chantier Naval and Florida Yacht Basin are entitled to prejudgment interest. Based upon the foregoing, it is hereby

ORDERED AND ADJUDGED that Plaintiffs are entitled to a judgment in the United States dollar equivalent to 93,784.80 French francs and prejudgment interest. The conversion rate is to be determined as of the date of this Order. Intervenor Florida Yacht Basin is entitled to a judgment of $26,063.91 and prejudgment interest. It is further

ORDERED AND ADJUDGED that the parties shall submit an Order of Final Judgment within ten (10) days of the date of this Order.